In re the CUSTODY OF
C.C.R.S., a Child,

and Concerning T.A.M. and M.A.M.,
Petitioners-Appellees.

and

C.R.S., Respondent–Appellant.

No. 92CA1142.

Colorado Court of Appeals,
Div. V.

Nov. 18, 1993.

Rehearing Denied Dec. 16, 1993.

Certiorari Granted May 9, 1994.

James Schum, Guardian Ad Litem.

David C. Johnston, Paonia, for petitioners-appellees.

Robert J. Golten, Boulder, Sam Cooper Hill, Hotchkiss, for respondent-appellant.

Opinion by Judge HUME.

This appeal arises from a custody proceeding that followed a voluntary private placement of a child, C.C.R.S., by his biological mother, C.R.S., in anticipation of formal relinquishment and adoption proceedings as permitted by § 19–5–104(1)(d), C.R.S. (1993 Cum.Supp.). The mother appeals from a district court order, entered pursuant to

§ 14–10–123, C.R.S. (1987 Repl.Vol. 6B), which awarded petitioners, T.A.M. and M.A.M., legal and physical custody of the child, subject to the mother's continuing right of visitation. We affirm.

The record on appeal is comprised of certain pleadings, motions, documents, and the final court order awarding custody to the petitioners, as designated by stipulation of the parties on appeal. No transcripts of any hearings conducted before the court or the court magistrate have been included in the record before us. The facts stated herein have been extracted from the documents in the limited record and from the briefs on appeal, and they are essentially undisputed.

During her pregnancy, the mother, then 23 years old and unmarried, made the decision to relinquish her child at birth for adoption. The mother and petitioners were brought together through relatives and mutual acquaintances, and an agreement for private placement was struck prior to the child's birth. The agreement was memorialized in two separate documents which the mother executed on March 6, 1990, the day after the birth of C.C.R.S. Those two documents were appended to the Petition for Custody filed by petitioners in September 1990, and they are included in the record on appeal.

One of the two documents, styled as a Custody Agreement, contains recitals that C.R.S. is the mother of the child born March 5, 1990, and that the identity of the child's father is unknown. It further recites that the mother also signed a Petition for Relinquishment of her own parental rights and for termination of the parental rights of the unknown father for filing by petitioners in relinquishment and adoption proceedings after the expiration of one year.

The Custody Agreement purports to grant full custody of the child to the petitioners, including authority to authorize medical treatment and make educational and religious decisions concerning the child, pending finalization of adoption proceedings. In addition, the Custody Agreement pledges the mother's cooperation in obtaining counseling necessary for relinquishment proceedings and an acknowledgement of her awareness of her right to independent legal counsel. It also states that the attorney who had prepared the Custody Agreement and the Petition for Relinquishment did not represent the mother.

The Petition for Relinquishment, which also was signed by the mother on March 6, 1990, contains an averment that she is one-half caucasian and one-half American Indian, without tribal membership or affiliation, and that while the identity of the child's father is unknown to her, the father could be one of a number of different men, none of whom are of American Indian heritage; that the mother's desire to relinquish is based upon her perception that she will be unable to provide a suitable social environment or necessary financial support for the child's needs; and that her desire to relinquish is voluntary and motivated by her consideration of the best interests of the child.

In addition, the Petition for Relinquishment recites, in some detail, the mother's understanding of the legal effects of relinquishment and adoption processes pursuant to Colorado law. It also avers that the mother expressly consents to custodial placement of the child with petitioners both before and after entry of an order of relinquishment and to their ultimate adoption of the child.

Pursuant to the agreement of the parties, petitioners took physical custody of C.C.R.S. immediately after his birth, and he has continued to reside in their household up to the present time. On August 31, 1990, nearly six months after the child had been placed with the petitioners, an agent for the mother advised petitioners' counsel that she wanted the child returned to her. However, the mother did not then make any personal or written demand for return of the child, nor did she initiate any proceedings seeking to establish or restore her right to custody of C.C.R.S.

On September 13, 1990, petitioners initiated a custody proceeding under the provisions of § 14–10–123, alleging that, during the period of six or more months that the child had lived with them, a strong bond had developed between themselves and the child and that the child's best interests would be served by an award of legal custody to them. They contemporaneously filed a motion for a

temporary order seeking to restrain the mother from interfering with petitioners' physical care and custody of the child, which was granted *ex parte* by the court magistrate. After a hearing held on October 30, 1990, which the mother did not attend, the magistrate granted petitioners' motion for temporary custody of C.C.R.S.

Thereafter, the Oglala Sioux Indian Tribe sought to intervene and effectuate a transfer of jurisdiction over the proceedings pursuant to the Indian Child Welfare Act. Counsel was appointed to represent the mother, and a guardian ad litem was appointed to represent the best interests of the child.

After a series of continuances requested by the Tribe, an order transferring jurisdiction was entered by the magistrate and subsequently reversed by order of the district court on July 23, 1991, and that ruling is not challenged here. Thereafter, additional delays were caused by the withdrawal of the mother's counsel, appointment of new counsel, and the latter's preparation for trial of the custody proceeding.

During this period, on June 17, 1991, the mother filed a renunciation of both the Custody Agreement and the Petition for Relinquishment which she had previously executed and requested that she be awarded custody of C.C.R.S. That filing was accompanied by her affidavit containing averments that she did not fully understand the two documents she had executed after the child's birth and that she had "changed her mind" about relinquishing her rights and consenting to the child's being adopted.

In addition, sometime prior to the hearing, the mother apparently advised her counsel that a man had acknowledged to her that C.C.R.S. was his child and had stated a willingness to help her in supporting him. That man's identity was revealed to the court and to petitioners' counsel, and the man was served with notice of the custody proceeding in early March 1992. No appearance has been made in such proceeding by or on behalf of that putative father. Nor does the record contain evidence in the form of blood tests relative to such alleged paternity.

After conducting a two-day bench trial in May 1992, the district court entered the permanent custody order now in question on May 26, 1992. The court made comprehensive and detailed findings as to why the best interests of the child would be served by his remaining in the legal and physical custody of the petitioners. Those findings are not disputed here, and they must be presumed to be supported by evidence in the record, since no trial transcript has been certified as a part of the record on appeal. *See Schleiger v. Schleiger*, 137 Colo. 279, 324 P.2d 370 (1958).

I.

The mother first argues that petitioners lacked standing to seek custody under § 14-10-123 of the Uniform Dissolution of Marriage Act (Dissolution Act). We disagree.

 Our primary function in interpreting a statute is to ascertain and give effect to the intent of the General Assembly, choosing a construction to further the purpose of the legislative scheme. And, while uniform statutes generally should be construed to bring uniformity to the law in the various states adopting them, other factors must also be considered. *In re Marriage of Cargill*, 843 P.2d 1335 (Colo.1993). Dissimilarities in the statutes as adopted by the various states must also be considered, and the general rules of statutory interpretation must be applied in an effort to determine and effectuate the intent of the General Assembly. *In re Marriage of Wells*, 850 P.2d 694 (Colo.1993).

The standing of non-parents to litigate claims and to be awarded custody of children against parental interests was well established in Colorado prior to the adoption of the Dissolution Act in 1971. *See Rippere v. Rippere*, 157 Colo. 29, 400 P.2d 920 (1965); *Root v. Allen*, 151 Colo. 311, 377 P.2d 117 (1962); *Walcott v. Walcott*, 139 Colo. 37, 336 P.2d 298 (1959).

In 1971, the Colorado General Assembly adopted a provision governing custody proceedings from the Uniform Marriage and Divorce Act (Uniform Act). *Compare* Colo. Sess.Laws 1971, ch. 130, § 46-1-23 at 529 *with* the Uniform Marriage and Divorce Act

§ 401, 9A Uniform Laws Annot. § 401(d) at 550 (1987 Master Ed.). Colorado was the first of only eight states to adopt the Uniform Act.

The pertinent portions of the Dissolution Act are now codified at § 14–10–123, C.R.S. (1987 Repl.Vol. 6B), as follows:

(1) A child custody proceeding is commenced in the district court or as otherwise provided by law:

(a) By a parent:

... or

(b) By a person other than a parent, by filing a petition seeking custody ... but only if the child is not in the physical custody of one of his parents....

The commissioner's comment concerning this provision of the Uniform Act explains that:

[S]ubsection (d)(2) [adopted verbatim by the Colorado General Assembly in 1971 and now codified as § 14–10–123(1)(b)] makes it clear that if one of the parents has physical custody of the child, a non-parent may not bring an action to contest that parent's right to continuing custody under the 'best interest of the child' standard....

Uniform Marriage and Divorce Act § 401, 9A Uniform Laws Annot. at 550 (Master Ed. 1987) (Commissioner's Comment).

The term "physical custody" is not defined either in the Uniform Act or in the Dissolution Act. In other states that have adopted § 401(d) of the Uniform Act, appellate courts have interpreted the term "physical custody" to mean something more than physical possession of the child. See Webb v. Charles, 125 Ariz. 558, 611 P.2d 562 (Ariz.Ct.App. 1980) (relinquishment of parental legal rights a prerequisite to divesting parent's right of physical custody for purposes of standing to commence custody proceeding); In re Custody of McCuan, 176 Ill.App.3d 421, 125 Ill. Dec. 923, 531 N.E.2d 102 (1988) (child's visiting grandparents with mother's consent insufficient to divest mother of physical custody of child); Henderson v. Henderson, 174 Mont. 1, 568 P.2d 177 (1977) (because natural mother never relinquished her parental

rights, child's aunt, who had physical possession following natural father's death, lacked standing to bring a custody proceeding).

In 1973, the Colorado statute was amended by the addition of a new subsection, now codified at § 14–10–123(1)(c), C.R.S. (1987 Repl.Vol. 6B). Under that amendment, a custody proceeding may be commenced:

By a person other than a parent who has had physical custody of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical custody.

See Colo.Sess.Laws 1973, ch. 162, § 46–1–23(1)(d) at 554.

In enacting § 14–10–123(1)(c), the Colorado General Assembly has indicated its preference for a more literal meaning of the phrase "physical custody." Under that section, a non-parent having had physical custody of a child for six months or more is granted standing to commence proceedings for legal custody of such child so long as such proceedings are begun within six months after the physical custody has ended.

■ The adoption of this section constitutes legislative recognition of the effects of "psychological parenting" upon the best interests of a child. See also § 19–3–702(5)(b), C.R.S. (1993 Cum.Supp.) (recognizing need for custodial stability and permanency planning for children adjudged dependent or neglected and removed from physical custody of their parents without terminating the parent-child relationship). It also makes clear that the Colorado General Assembly did not intend to equate "physical custody" with either "legal custody" or the "parental right to continued physical or legal custody."

Other provisions of the Dissolution Act, while not defining the term "physical custody," are also instructive as to its meaning. For example, the term "shared physical custody" as applied to parents for purposes of calculating child support means each parent keeping the child for a specified minimum number of overnight stays each year and contributing to the child's expenses in addition to payment of child support. Section 14–10–115(8), C.R.S. (1993 Cum.Supp.).

Similarly, § 14–10–123.5(1), C.R.S. (1987 Repl.Vol. 6B) clearly separates the concepts of parental physical and legal custody of children in dissolution or separation proceedings. Legal custody may be awarded under that section jointly to both parents simultaneously with awards of unequal physical custodial rights to the respective parents.

In addition, in § 14–13–103(9), C.R.S. (1987 Repl.Vol. 6B), Colorado's enactment of the Uniform Child Custody Jurisdiction Act, the term physical custody is defined as "actual possession and control of a child."

■ We thus conclude, consistent with the views expressed in other Colorado decisions under the Dissolution Act, that, in adopting § 14–10–123(1)(b), our General Assembly intended that a literal meaning be applied to the term "physical custody" in adopting § 14–10–123(1)(b). Hence, in keeping with the overriding policy of promoting the best interests of children, Colorado has adhered to a liberalized view as to the standing of non-parents to commence and to participate in custody proceedings. See Abrams v. Connolly, 781 P.2d 651 (Colo.1989); In re Marriage of Dureno, 854 P.2d 1352 (Colo.App. 1992); In re Marriage of Trouth, 631 P.2d 1183 (Colo.App.1981); In re Marriage of Tricamo, 42 Colo.App. 493, 599 P.2d 273 (1979).

We reject the mother's argument that only step-parents or blood relatives of the child or his parents should be accorded standing as "person[s] other than a parent" under § 14–10–123(1)(b) and (c). The fact that reported cases involved such persons is attributable to the fact that, in our society, persons are more likely to develop an interest in, or a relationship with, children of relatives than with children of strangers. However, we find no language in the statute or in any Colorado appellate decision to indicate that such relationship is a legal requirement for non-parent standing to commence custody proceedings.

Likewise, we are unpersuaded by the argument that a liberalized view of non-parent standing to commence custody actions will serve to reward persons who obtain physical custody over children by criminal, fraudulent, or other forms of misconduct. Under the Colorado statutory scheme, consideration of evidence of such misconduct has been left to the discretion of trial courts in determining the best interests of children on an *ad hoc* basis, rather than by imposition of an arbitrary and inflexible rule of standing. We believe it unlikely that a trial court would find it in a child's best interest to award custody to a person who had obtained physical custody by kidnapping, fraud, or other overreaching conduct.

II.

■ The mother also contends that § 14–10–123(1)(b) cannot be used as a vehicle to obtain custody of a child who has been placed by a parent with non-parents in contemplation of relinquishment and adoption proceedings. We disagree.

Here, the mother's consent to placement upon the birth of her child was not found to be involuntary or the result of fraud or overreaching by petitioners. Rather, the placement was made upon the mother's expressed belief that it was in the child's best interests.

Although the placement was initially made in contemplation that it would be followed by relinquishment and adoption proceedings under the Colorado Children's Code, such proceedings later became impossible when the mother withdrew her consent thereto and did not honor her agreement to obtain counseling as required by § 19–5–101, et seq., C.R.S. (1993 Cum.Supp.). In so doing, the mother acted within her legal rights and thereby prevented the initiation of the proceedings to which she had previously consented.

Consequently, since no proceedings were ever commenced under the Children's Code for relinquishment or adoption of C.C.R.S., custody proceedings under the Dissolution Act were not preempted by the provisions of §§ 19–1–104(1)(c), 19–1–104(4), or 19–1–104(5), C.R.S. (1993 Cum.Supp.). See Johnson v. Black, 137 Colo. 119, 322 P.2d 99 (1958); cf. People in Interest of D.C., 851 P.2d 291 (Colo.App.1993).

Moreover, although the mother advised petitioners' counsel that she desired to withdraw her consent to relinquishment and adoption and to regain custody of C.C.R.S.,

the record before us does not suggest that she took any steps to regain physical custody of the child at that time. Indeed, she did not personally appear or otherwise present evidence at the temporary custody hearing held on October 30, 1990. According to the record before us, the mother's own cross-petition for custody of C.C.R.S. was first filed with the district court on or about June 17, 1991, after the child had been in the physical custody and control of petitioners for over one year.

Furthermore, there is no evidence that C.C.R.S. has ever been in the mother's physical custody since his birth. There was evidence that, despite an agreement for continued visitation and contact between the mother and C.C.R.S. during his placement with petitioners, mother has made little or no effort to establish a relationship with the child. In fact, the record reflects that, by the date of the final district court hearing, the mother had visited the child on only two brief occasions since his birth, despite being awarded the right of visitation in the magistrate's temporary custody order.

Under these circumstances, not only does § 14–10–123 permit proceedings for custody by petitioners, but the best interests of the child strongly dictate resolution of the competing interests of the natural and psychological parents in whatever adjudicative forum was then available for determination of such issues.

### III.

In support of her contention as to petitioners' lack of standing under § 14–10–123(1)(b) and her argument that the trial court erred in using the best interests standard rather than requiring petitioners to prove parental unfitness before terminating her custodial rights, the mother relies upon several decisions from the United States Supreme Court that recognize a fundamental constitutional liberty interest in the preservation of parental rights of care, custody, and control of their children. We conclude that such reliance is misplaced under the circumstances presented here.

Initially, we note that the mother's contentions on appeal include constitutional arguments that are not addressed in the trial court's findings, conclusions, and custody order. In addition, the limited record on appeal does not indicate whether such arguments were raised in the trial court proceedings.

■ Generally, appellate courts will not consider issues, arguments, or theories not previously presented in trial proceedings. *Matthews v. Tri–County Water Conservancy District*, 200 Colo. 202, 613 P.2d 889 (1980).

Here, however, the mother argues that her fundamental liberty interest in her parent-child relationship with C.C.R.S. limits or precludes both the custody proceedings and the resulting order. Hence, since issues concerning fundamental constitutional rights have been asserted and fully briefed and argued by all parties on appeal, and since the ultimate issue relating to custody of a minor child requires an expedited resolution, we elect to address such arguments in this appeal. *See Robinson v. People*, 173 Colo. 113, 476 P.2d 262 (1970); *In re Marriage of Trouth, supra.*

In *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the court upheld the interest of an unwed natural father to be accorded notice and a due process hearing as to his fitness before terminating his parental rights in dependency proceedings commenced after the death of the children's mother. In holding unconstitutional an Illinois statute which presumed the father of illegitimate children to be unfit, the court observed that the effect of that statute was to eliminate automatically an unwed father's parental rights in violation of his rights of due process and equal protection under the law.

Here, unlike the circumstances in *Stanley,* these were not dependency proceedings instituted by the state which will result in termination of the mother's parental rights. In addition, the mother was afforded notice and an opportunity for hearing to determine her right to custody of C.C.R.S.

In *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), the court

held that the parental rights of a father who had never sought or had physical or legal custody of a child could be terminated in a step-parent adoption proceeding by application of a best interest standard rather than upon a finding of unfitness as to the father. There, the court noted that, while the father had not abandoned the child, he had not undertaken any significant responsibility for its rearing, nor had he attempted to legitimize the child pursuant to Georgia law during the eleven years of the child's life prior to the filing of the step-father's petition for adoption. The court also noted that this was not an attempt by the state or the adoptive parents to break up a natural family; but rather was a recognition of a *de facto* family unit already in existence. The court held that, under those circumstances, the state was not required to find more than that the adoption and the denial of the legitimization was in the best interests of the child.

In *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the court held that a "clear and convincing evidence" standard of proof was required in a state's parental rights termination proceeding. There, the court noted that, because the nature of termination is final, permanent, and irrevocable as to all parental rights, a heightened burden of proof is necessary in order to comport with the requirements of due process. *See also People in Interest of E.A.*, 638 P.2d 278 (Colo.1982).

■ Here, unlike the terminations contemplated in *Santosky* and *E.A.*, the mother's parental rights were not subject to full, final, and irrevocable severance in custody proceedings pursuant to § 14–10–123. She maintained a right to have continuing contact and visitation or parenting time with the child and, upon appropriate changed circumstances, to move for and possibly be awarded custodial rights, in addition to her preserved residual parental rights.

In *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the court upheld a New York statute that permitted a father of an illegitimate child to claim paternity by filing a notice of his intent to do so in a state putative father registry. Upon so registering, a father became entitled to notice of any adoption proceedings concerning the child. A father who had not so registered argued that the statute was violative of his right of due process arising from his fundamental liberty interest in his two-year-old illegitimate daughter.

The U.S. Supreme Court once again recognized the difference between a developed parent-child relationship and one in which the natural parent had never demonstrated a commitment to the responsibilities of parenthood by coming forward to participate in the rearing of the child. The court noted that the father never had a significant custodial, personal, or financial relationship with the child and did not seek to establish any legal tie until his daughter was two years old. In rejecting the father's appeal, the court held that New York's process under the registry status was sufficient to satisfy the rights arising from such an undeveloped parent-child relationship.

Our review of these authorities convinces us that, since this case does not involve termination or relinquishment of parental rights nor their abrogation by adoption, due process does not require a showing of parental unfitness or the use of an enhanced standard of proof.

■ Here, the trial court recognized the general rule that a biological parent is ordinarily entitled to have the first and prior right to custody of her child, and it indulged a presumption to that effect. However, that presumption may be rebutted by evidence establishing that the welfare of the child would be promoted by awarding custody to a non-parent. *See Abrams v. Connolly, supra.*

We conclude, therefore, that the trial court did not err in determining that petitioners had standing to proceed under the provisions of § 14–10–123, in determining the issue of custody under the best interests of the child standard, or in refusing to require a showing of the mother's parental unfitness.

The order is affirmed.

DAVIDSON, J., concurs.

TAUBMAN, J., dissents.

Judge TAUBMAN dissenting.

Because I believe that the majority upholds the award of permanent custody to prospective adoptive parents in violation of the natural mother's statutory and constitutional rights, I dissent. In particular, I am concerned that the majority permits the circumvention of our state's relinquishment statutes by allowing the prospective adoptive parents to rely on a provision in the Dissolution of Marriage Act in a manner never contemplated by the General Assembly.

Accordingly, I would reverse the district court's order denying respondent, C.R.S., (mother) permanent custody of her child and awarding permanent custody to petitioners, T.A.M. and M.A.M., the prospective adoptive parents.

C.R.S. was not married during her pregnancy and decided to give up her baby for adoption. Shortly before the child's birth, she and the prospective adoptive parents signed a "Custody Agreement" drafted by the petitioners' attorney. In that document, the mother designated petitioners as guardians of the unborn child and stated that she would relinquish her parental rights after the child was one year old so that they could adopt him. However, although it was implicit in the "agreement" that petitioners would care for the child after his birth, the document contained nothing obligating them to do anything.

The child, C.C.R.S., was born on March 5, 1990. The following day the mother signed a document entitled "Petition for Relinquishment and Waiver of Notice and Petition for Termination of the Parent–Child Relationship of Natural Father." This document stated that the natural father had refused support and had "abandoned" him, only one day after C.C.R.S. was born. The parties agreed that the petition for relinquishment of mother's parental rights and petition for termination of the father's parental rights would be filed one year later. At that time, they contemplated that a court could enter a final order transferring legal custody and guardianship of the child to petitioners.

The mother was not represented by legal counsel when she signed the foregoing docu-

ments. Moreover, the intended relinquishment and adoption was defective because she was not adequately counselled nor fully advised of the consequences of the relinquishment, as mandated by § 19–5–103, C.R.S. (1993 Cum.Supp.).

Less than six months later, on August 31, 1990, the mother through an agent, sought to withdraw her consent to the adoption.

Less than two weeks later, on September 13, 1990, the petitioners filed a Petition for Custody and sought a temporary restraining order against removal of the child and a court order awarding them temporary and permanent custody of the child. That day, the trial court granted petitioners a temporary restraining order in an *ex parte* proceeding. Although the motion was verified by T.A.M., it did not allege any specific harm. It stated only that T.A.M. had read the motion and believed that the child was likely to come to physical and emotional harm if his mother was allowed custody of her child.

The court continued temporary custody with the prospective adoptive parents following an uncontested hearing in late October 1990. During the next 18 months, the mother sought to transfer the case to the Oglala Sioux Indian Tribe, pursuant to the Indian Child Welfare Act, believing that under that act the document relinquishing her son would necessarily be found invalid. Although the magistrate decided that proceedings should be transferred to the tribe, this order was reversed by the trial court on July 23, 1991. The mother met further delays while the trial court sought to obtain a pro bono lawyer to represent her.

Meanwhile, on June 17, 1991, the mother filed her own motion for custody accompanied by her affidavit renouncing the custody agreement and Petition for Relinquishment she had signed in February and March 1990. The affidavit stated that she had signed these documents without fully understanding them, without the advice of an attorney, and that she had now changed her mind.

Following an evidentiary hearing in May 1992, the trial court, based on a determination of the child's best interests, granted

petitioners permanent custody of the child under the provisions of the Dissolution of Marriage Act (Dissolution Act), § 14–10–123, C.R.S. (1987 Repl.Vol. 6B).

The trial court acknowledged that the mother "has demonstrated that she can be a fit and proper parent" as evidenced by her success with another child, a seven-year-old son. The court also conceded that the mother had not received the counseling required by the relinquishment statute. Nevertheless, the court concluded that petitioners could provide a more "secure and healthy home environment" than the mother.

The trial court found that the mother was single, received public assistance, was pregnant with a third child, and lived in a poor neighborhood. It emphasized that the mother had made little attempt to visit the child or send gifts. However, the trial court also acknowledged that visits to the child were financially difficult for the mother given the distance between her home and her child's home and her limited income.

The court further found, based on conflicting expert testimony, that a parent-child relationship had developed between the child and petitioners and that a severance of that relationship would be psychologically traumatic to the child.

Based on these findings, the court awarded permanent custody of the child to petitioners and allowed the mother "reasonable visitation on such terms and conditions as the parties may agree." The court made no provision for any additional legal proceedings but noted that any further custody proceedings would be decided under § 14–10–131, C.R.S. (1987 Repl.Vol. 6B), which precluded the mother from seeking a change of custody for at least two years from the date of the court's permanent custody order.

On appeal, the mother argues that § 14–10–123 of the Dissolution Act cannot be used to circumvent the specific provisions of the Children's Code governing relinquishment of parental rights and adoption. Specifically, she argues that petitioners lacked standing to seek custody under the Dissolution Act and that a court can award custody to a non-parent only if (1) the natural parent is found

to be unfit or (2) the natural parent has abandoned the child over a period of years *and* the non-parent seeking custody is either a blood relative or a step-parent who has active custody of the child during that time.

I conclude, for reasons discussed below, that the mother's purported relinquishment was invalid, that the petitioners lack standing to seek custody under the Dissolution Act, and that even if such standing is proper, the trial court violated the mother's constitutional right to custody of her child by applying a "best interest of the child" standard.

### I. Relinquishment & Adoption

Because the controversy over the child originated as a private placement adoption, I believe it is necessary to consider the law governing parental relinquishment and adoption *in pari materia* with § 14–10–123 in order to determine the propriety of the district court's order. *See E.P. v. District Court,* 696 P.2d 254 (Colo.1985).

When two or more statutes relating to the same subject are implicated, they must be considered and construed together to ascertain legislative intent and to avoid reaching an inconsistent, absurd, or unjust result. *See Walgreen Co. v. Charnes,* 819 P.2d 1039 (Colo.1991); *Gillies v. Schmidt,* 38 Colo.App. 233, 556 P.2d 82 (1976).

Adoption was unknown at common law and thus the proceedings governing both adoption and the termination of parental rights are wholly statutory. *Israel v. Allen,* 195 Colo. 263, 577 P.2d 762 (1978) (adoption); *People in Interest of A.M.D.,* 648 P.2d 625 (Colo.1982) (parental termination).

The statutes governing parental relinquishment, § 19–5–101, et seq., C.R.S. (1993 Cum.Supp.), and adoption, § 19–5–210, et seq., C.R.S. (1993 Cum.Supp.), are part of the Children's Code. Because adoption irrevocably affects the lives of children and their biological and adoptive parents, strict compliance with the statutory provisions and procedures is required. *See In re Petition of E.R.S. v. O.D.A.,* 779 P.2d 844 (Colo.1989).

The Children's Code explicitly provides that parental rights can be relinquished only pursuant to statute:

No parent shall relinquish the parent-child legal relationship with a child other than in accordance with the provisions of this article.

Section 19–5–101(2), C.R.S. (1993 Cum. Supp.).

Moreover, the Code requires mandatory counseling of the natural parent(s) prior to relinquishment:

Any parent desiring to relinquish his child shall:

(a) Obtain counseling from the county department of social services in the county where such parent resides or from a licensed child placement agency. . . .

Section 19–5–103(1), C.R.S. (1993 Cum. Supp.).

The Code also makes clear that, in private placement adoptions, prospective adoptive parents cannot become legal guardians of the adoptive child until a final order of relinquishment has been entered:

Birth parent or parents may designate a specific applicant with whom they may wish to place their child for purposes of adoption. After assessment and approval of the potential adoptive parents and subsequent relinquishment of the child, the court shall grant guardianship of the child to a person or agency described in section 19–5–104(1) until finalization of adoptive placement. A county department may provide adoption services to birth parents who request designated adoption only in cases in which the county has legal custody of the child prior to the filing of the petition to relinquish. All requirements and provisions of this article pertaining to relinquishment and adoption shall apply to designated adoptions.

Section 19–5–206(2), C.R.S. (1993 Cum. Supp.).

In addition, under § 19–5–104(1)(d), C.R.S. (1993 Cum.Supp.), the prospective adoptive parents cannot qualify as court-appointed guardians until the adoptive child has resided in their home for one year or longer.

The statutory provisions governing relinquishment cannot be waived, *Fackerell v. District Court,* 133 Colo. 370, 295 P.2d 682 (1956), and failure to comply with the law has been held to invalidate a natural parent's consent to adoption. *See Foley v. Carnesi,* 123 Colo. 533, 232 P.2d 186 (1951) (failure to have mother's written consent witnessed and notarized).

In this case, it is undisputed that the mother's purported relinquishment was invalid as a matter of law.

Section 19–5–103(1)(b)(II), C.R.S. (1993 Cum.Supp.) provides:

The petition [for relinquishment] shall be accompanied by a statement indicating the nature and extent of counseling furnished to the petitioner, if any, and the recommendations of the counselor. If the petitioner has not received the counseling required by paragraph (a) of this subsection (1), the petition shall be continued, and the petitioner shall be referred for counseling by the court.

Here, the petition for relinquishment contained no such statement; indeed, the mother sought to revoke her consent before any relinquishment or adoption proceedings were filed in the district court.

Also, private placement or "designated" adoptions must be monitored and supervised by licensed child placement agencies. However, the record indicates that, contrary to § 19–5–206(2), petitioners were not assessed and approved by a licensed child placement agency prior to the placement of the child in their care. Furthermore, no agency consent was given for petitioners to adopt the child. *See* Price & McElhinny, *Substantive Changes in Adoption and Relinquishment Law in Colorado,* 16 Colo.Law. 2183 (December 1987).

Additionally, I note in passing that the difficulty of relying on Colorado's private placement adoption statutes was recognized several years before petitioners sought to adopt the child. A 1983 article in The Colorado Lawyer cautioned:

[T]here are major drawbacks to private placements of a child by the natural parent. One impediment is that complete termination of parental rights may not have occurred. Another common problem is where the parties may wait to begin termination proceedings until the prospective

parents have had the child in their home for the one-year period and are ready to file for adoption. This has resulted in numerous instances where children have been reclaimed after the biological mother has reconsidered her decision and either revoked or withheld her consent. *This can happen even after the child has been with the prospective adoptive parents for several years.* (emphasis added)

Christensen, *Adoption Procedures of Minor Children in Colorado,* 12 Colo.Law. 1057, 1061 (July 1983).

Because parental or agency consent is a *jurisdictional requisite* to adoption, once necessary consent to the adoption is withdrawn, the courts are without jurisdiction to enter an adoption decree. *Department of Social Services v. District Court,* 742 P.2d 339 (Colo.1987).

In addition, our courts have ruled that in order for a natural parent's consent to an adoption to be legally binding, the consent must be *informed,* i.e., the natural parents must know and understand "the import and consequences of what they were doing." *People in Interest of J.B.P.,* 44 Colo.App. 95, 98, 608 P.2d 847, 850 (1980).

Because this case was tried under § 14–10–123, the trial court did not address the mother's contention that she misunderstood the import and consequences of her consent to the adoption. However, inasmuch as the mother relinquished the child prior to receiving mandatory counseling, it is uncontroverted that her relinquishment and consent to the adoption were invalid as a matter of law. It is equally clear that mother could legally revoke her consent to the adoption prior to the commencement of relinquishment proceedings, and certainly prior to having received mandatory counseling.

Conversely, petitioners knew, or should have known, that the mother could legally withdraw her consent to the adoption any time within the one-year period mandated under § 19–5–104(1)(d) and prior to the entry of a final order of relinquishment.

I consider these factors to be dispositive under the next part of my discussion.

## II. Applicability of the Dissolution Act

The issue of non-parent standing under § 14–10–123(1)(b) and (c), C.R.S. (1987 Repl. Vol. 6B) is a question of first impression in Colorado under the circumstances presented here.

The statute provides that:

(1) A child custody proceeding is commenced in the district court or as otherwise provided by law:

(a) By a parent:

. . . .

(b) By a person other than a parent, by filing a petition seeking custody of the child in the county where the child is permanently resident or where he is found, *but only if the child is not in the physical custody of one of his parents.*

(c) By a person other than a parent who has had physical custody of a child for a period of six months or more, *if such action is commenced within six months of the termination of such physical custody.* (emphasis added)

Sections 14–10–123(1)(a) and (b), C.R.S. (1987 Repl.Vol. 6B) were adopted verbatim from § 401(d) of the Uniform Marriage and Divorce Act (Uniform Act). The Commissioners' Note to that section was intended to codify the presumption that natural parents have a superior right to the care and custody of their children absent a judicial determination of unfitness or dereliction of parental responsibilities. It states:

[This subsection] makes an important distinction between custody disputes commenced by parents and those commenced by some other person interested in a particular child. . . . (S)ubsection (d)(2) makes it clear that if one of the parents has *physical custody* of the child, a non-parent may not bring an action to contest that parent's right to continuing custody under the "best interest of the child" standard of Section 402. If a non-parent (a grandparent or an aunt or uncle, perhaps) wants to acquire custody, he must commence proceedings under the far more stringent standards for intervention provided in the typical Juvenile Court Act. In short, this subsection has been devised to

protect the "parental rights" of custodial parents and to insure that intrusions upon those rights will occur only when the care the parent is providing the child falls short of the minimum standard imposed by the community at large—the standard incorporated in the neglect or delinquency definitions of the state's Juvenile Court Act. 9A Uniform Laws Annot., Uniform Marriage & Divorce Act, § 401 (1987 Master Ed.) (Commissioners' Note) (emphasis added).

Other jurisdictions which have adopted this provision of the Uniform Act have devised a test for non-parent "standing" to commence a custody proceeding.

The term "standing" in this context has a meaning distinct from its conventional usage. Generally, standing connotes whether a litigant has a justiciable interest in a controversy, and it is one of the components of the court's subject matter jurisdiction. However, the term "standing" under this section of the Uniform Act has been interpreted with respect to non-parents as requiring a showing that the child is "not in the physical custody of one of his parents."

When a non-parent meets this requirement, the court may then consider the non-parent's claim for legal custody of the child under the "best interest of the child" standard. *See In re McCuan*, 176 Ill.App.3d 421, 125 Ill.Dec. 923, 531 N.E.2d 102 (1988); *In re Custody of Barokas*, 109 Ill.App.3d 536, 65 Ill.Dec. 181, 440 N.E.2d 1036 (1982).

The term "physical custody" is not defined in either the Dissolution Act or the Uniform Act. However, other jurisdictions which have adopted this provision of the Uniform Act have construed "physical custody" to mean something more than actual, physical possession of the child at the time the custody litigation is initiated. As stated by an Illinois court, "[t]o hold differently would be to encourage abductions of minors in order to satisfy the literal terms of the standing requirement and would, in reality, defeat the statutory intendment." *In re Custody of Peterson*, 112 Ill.2d 48, 54, 96 Ill.Dec. 690, 692–93, 491 N.E.2d 1150, 1152–53 (1986).

Even if a different interpretation would not go so far as to encourage abductions, as the majority contends, at a minimum such a construction would encourage circumvention of the stringent requirements of the relinquishment and adoption statutes.

Accordingly, the standing test evolved by these jurisdictions balances several different factors, including the manner in which the child came into the non-parent's physical possession, the intentions and expectations of the natural parent or parents when relinquishing the child, and the duration of the non-parent's possession. Generally, courts have required non-parents to establish that a natural parent's relinquishment of the child was both *legal* and *voluntary*. *See Webb v. Charles*, 125 Ariz. 558, 611 P.2d 562 (Ct.App. 1980) (since natural father did not relinquish his legal rights, the maternal grandmother lacked standing to seek custody); *In re McCuan, supra* (where child was simply visiting grandparents with the natural mother's consent, there was no relinquishment of physical custody); *Henderson v. Henderson*, 174 Mont. 1, 568 P.2d 177 (1977) (because natural mother never relinquished her parental rights, child's aunt lacked standing to seek custody).

Courts further have ruled that a non-parent cannot deprive the natural parent of physical custody by simply refusing to return the child to the parent upon demand. *Hanson v. McGowan*, 197 Ill.App.3d 708, 144 Ill.Dec. 183, 555 N.E.2d 80 (1990).

In accordance with the mandate of § 14–10–104, C.R.S. (1987 Repl.Vol. 6B), to apply and construe the provisions of the Uniform Act uniformly with those states that have enacted it, *see In re Marriage of Wells*, 850 P.2d 694 (Colo.1993), I find the foregoing cases persuasive and authoritative.

Although the mother in this case transferred physical possession of the child to petitioners at birth, she revoked her consent to the custody arrangement and planned adoption before the child was six months of age. Once her consent was revoked, petitioners had no legally cognizable right to continued custody of the child.

Further, because the mother's purported relinquishment was invalid as a matter of law under § 19–5–101, et seq., I believe it would

be incongruous to hold that mother nevertheless "voluntarily" relinquished her child for purposes of granting petitioners standing to seek custody under § 14–10–123(1)(b) or (c).

While there are cases in Colorado in which custody of a child has been awarded to non-parents over the objection of a natural parent, in most of these cases the evidence clearly established some form of parental unfitness or constructive abandonment. *Walcott v. Walcott,* 139 Colo. 37, 336 P.2d 298 (1959) (mother suffered from psychotic schizophrenia); *Devlin v. Huffman,* 139 Colo. 417, 339 P.2d 1008 (1959) (6–year abandonment by the mother); *Coulter v. Coulter,* 141 Colo. 237, 347 P.2d 492 (1959) (7–year abandonment by the mother); *Root v. Allen,* 151 Colo. 311, 377 P.2d 117 (1962) (8–year abandonment by the father). *Cf. Turner v. Hunter,* 142 Colo. 129, 350 P.2d 202 (1960); *Phillips v. Christensen,* 121 Colo. 380, 216 P.2d 659 (1950); *Wells v. Wilbur,* 471 P.2d 628 (Colo.App.1970) (not selected for official publication).

The other cases on which the majority relies do not support its holding. In *Rippere v. Rippere,* 157 Colo. 29, 400 P.2d 920 (1965), the court *reversed* a custody award to non-parents. In *Abrams v. Connolly,* 781 P.2d 651 (Colo.1989), the issue before the court was not custody *per se,* but rather, the natural father's liability for child support arrearages following the death of the mother who was the minor child's custodial parent.

Furthermore, *Abrams v. Connolly, supra, In re Marriage of Dureno,* 854 P.2d 1352 (Colo.App.1992), *In re Marriage of Trouth,* 631 P.2d 1183 (Colo.App.1981), and *In re Marriage of Tricamo,* 42 Colo.App. 493, 599 P.2d 273 (1979), on which the majority relies, all involved dissolution or post-dissolution proceedings in which the trial court had original or continuing jurisdiction over the issue of custody under either § 14–10–123(1)(a) or § 14–10–131, C.R.S. (1987 Repl.Vol. 6B). These cases, therefore, are not dispositive of the issue of non-parent standing under § 14–10–123(1)(b) and (c).

### III. The Conflict between § 14–10–123(1)(b) of the Dissolution Act and the Colorado Children's Code

I agree with the mother that § 14–10–123 of the Dissolution Act cannot be used to circumvent the specific provisions of the Colorado relinquishment and adoption statutes.

Statutory constructions which defeat legislative intent, or which render a statute invalid, ineffective, or unconstitutional are to be avoided. Section 2–4–201, C.R.S. (1980 Rep. Vol. 1B).

If statutes on the same subject are potentially conflicting, the court must reconcile the statutes, if possible, to ensure a consistent and sensible application of the law. *In re Estate of David v. Snelson,* 776 P.2d 813 (Colo.1989). If the statutes cannot be reconciled, and there is a conflict between specific and general statutes, the provisions of the specific statute control to the extent of the inconsistency. *In re M.S. v. People,* 812 P.2d 632 (Colo.1991); *L.D.G. v. E.R.,* 723 P.2d 746 (Colo.App.1986).

Section 14–10–123(1)(b) is a general statute which governs child custody disputes between private individuals, usually in the context of a dissolution of marriage action. In contrast, the Children's Code is a comprehensive legislative scheme devised to administer the state's *parens patriae* responsibility to minor children. The relinquishment and adoption provisions establish a two-tiered judicial procedure whereby, through state action, one parent-child relationship is terminated and a second parent-child relationship is established.

In a recent dependency and neglect (D & N) proceeding, this court ruled that the specific statutory provisions of the Children's Code take precedence over the general custody provisions of the Dissolution Act in proceedings under the Children's Code. *People in Interest of D.C.,* 851 P.2d 291 (Colo.App. 1993). There, the minor child's foster parents had intervened in the D & N action, seeking custody of the child under § 14–10–123 of the Dissolution Act. The trial court ordered a custody evaluation pursuant to § 14–10–127, C.R.S. (1993 Cum.Supp.), but otherwise adhered to the Children's Code in determining custody.

A division of this court disapproved of the trial court's reliance on the Dissolution Act,

holding that once a petition for custody under the Dissolution Act is certified pursuant to § 19–1–104(4), C.R.S. (1993 Cum.Supp.) of the Children's Code as part of a D & N action, the provisions of the Dissolution Act are "no longer relevant to the proceedings." We reasoned that such a result was in harmony with the differing policies underlying the Dissolution Act and the applicable provisions of the Children's Code:

> [T]o engraft the custody provisions of the [Dissolution Act] onto proceedings under the Children's Code would only lead to confusion and conflict between countervailing policies and procedures under the two different acts.

*People in Interest of D.C., supra,* at 294. I believe the potential conflict between the two acts is even more direct and far-reaching under the circumstances of this case.

Petitioners here acquired temporary custody of the child pursuant to the relinquishment and adoption provisions of the Children's Code and they should have known that their right to continued custody was contingent upon compliance with the mandatory provisions of that statutory scheme. However, as soon as the mother withdrew her consent to the purported relinquishment, petitioners resorted to the expedient of a less stringent custody proceeding under § 14–10–123.

As a result, the prospective adoptive parents merely had to show that an award of permanent custody in their favor was in the child's best interest. They were not required to demonstrate that the mother knowingly, voluntarily, intelligently, and after counseling, was relinquishing her child. Nor were they required to show that the mother was unfit, as the state would have had to prove in a D & N proceeding.

Petitioners could not have satisfied these tests had they been required to do so. Clearly, the mother's consent to the relinquishment was invalid as a matter of law, and her unfitness could not be proven. Indeed, the trial court explicitly found her to be a fit parent.

Therefore, by affirming the trial court, the majority implicitly holds that any time an adoption fails or is invalidated for failure to comply with the relinquishment and adoption statutes, the prospective adoptive parents can simply petition the court for permanent custody of the child under § 14–10–123. It is even conceivable that § 14–10–123 will be invoked in the first instance to by-pass the more stringent requirements of the Children's Code altogether. Such circumvention of the Children's Code would defeat the important public policies and constitutional safeguards underlying the relinquishment and adoption statutes.

More importantly, this result relegates the minor children in such controversies to a legal limbo in which the natural parents' rights are not legally terminated, and yet, the children's custodial caretakers are precluded from adopting them. I find it unthinkable that the General Assembly intended such an unjust result.

In a similar case, which has attracted national media attention, *DeBoer v. Schmidt,* — U.S. ——, 114 S.Ct. 1, 152 L.Ed.2d 755 (1993), Justice Stevens wrote:

> Applicants' claim that Jessica's best interests will be served by allowing them to retain custody of her rests, in part, on the relationship that they have been able to develop with the child after it became clear that they were not entitled to adopt her. Neither Iowa law, Michigan law, nor federal law authorizes unrelated persons to retain custody of a child whose natural parents have not been found to be unfit simply because they may be better able to provide for her future and her education. As the Iowa Supreme court stated: "[C]ourts are not free to take children from parents simply by deciding another home appears more advantageous." *In re B.G.C.,* 496 N.W.2d 239, 241 (Iowa 1992).

The Colorado Supreme Court used similar language in *Turner v. Hunter, supra,* 142 Colo. at 132–33, 350 P.2d at 204, more than thirty years ago in ordering the return of three minor children to their natural mother:

> We fully understand and appreciate the desire of the Turners to keep Phyllis, who has been treated by them as their own since infancy.... Nevertheless, the trial court has found that the mother of Phyllis

is a fit person to have custody of her daughter.... We cannot award custody of children to aunts and uncles against the claim of parents for the reason that the former can better afford to make expenditures upon the children than can the latter.

Therefore, based on the foregoing considerations, I would hold that petitioners lacked standing to seek custody of the child under § 14–10–123 of the Dissolution Act, and that § 14–10–123(1)(b) and (c) cannot be used to award custody to prospective adoptive parents in the case of a failed relinquishment and adoption under the Colorado Children's Code.

## IV. Constitutional Standard

Even if § 14–10–123 could be interpreted to allow the prospective adoptive parents to initiate a custody proceeding, I believe the constitution requires that before a "best interests of the child" standard is applied, there must be a finding by a clear and convincing evidence standard that the natural mother is unfit. Because such a standard was not applied here, I believe that § 14–10–123 was applied unconstitutionally.

In rejecting the mother's constitutional arguments, the majority gives short shrift to the fundamental constitutional liberty interests of a parent in a child as described by the U.S. Supreme Court. The majority also ignores numerous decisions, both from states which have adopted analogs to § 14–10–123 and other states, which have held that constitutional due process applies not just to terminations of parental rights, but to awards of permanent custody to third parties as well. Indeed, I believe the great weight of authority of decisions from other state courts supports my conclusion regarding the mother's constitutional rights here.

### A.

For many years, the U.S. Supreme Court has recognized the relationship between a parent and a child as involving a fundamental constitutional right.

By 1981, enough cases involving a parent's constitutional liberty interests in his or her children had come before the U.S. Supreme Court that Justice Stewart was able to write: "The court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody, and management' of his or her children is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640, 649–650 (1981) (*quoting Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972)).

Family privacy and parental authority have been afforded both substantive and procedural protection under the due process clause. This cluster of constitutional protections includes, *inter alia,* the right of the family to live together, *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the right of parents to raise their children as they deem fit, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (the State cannot require Amish parents to send their children to school beyond 8th grade), and the right of parents to educate their children without state interference. *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

Here, the trial court recognized the general rule that parental rights cannot be terminated without notice and a hearing, *Stanley v. Illinois, supra,* and without clear and convincing evidence of parental unfitness. *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

I believe the mother here has a constitutionally protected interest in the *custody* of her child. I base this conclusion largely on cases dealing with the rights of unwed fathers: *Stanley v. Illinois, supra; Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); and *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In these cases the court held, either expressly or by negative implication, that unwed fathers have a constitutionally protected inter-

est in having the *opportunity* to establish a parent-child relationship with their children. A common thread woven through these cases is that substantive and procedural constitutional guarantees are implicated whenever a parent demonstrates a commitment to the responsibilities of parenthood by "coming forward" to participate in the rearing of his child.

Taken together, *Quilloin v. Walcott, Caban v. Mohammed*, and *Lehr v. Robertson* suggest that the mother here has a constitutionally cognizable interest in the relationship with her child. Here, she came forward before the child was 6 months old and, by requesting that *custody* of the child be returned to her, demonstrated her willingness to assume both the "opportunity" and "some measure of responsibility" for the child's future.

One additional U.S. Supreme Court case deserves mention.

In *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), individual foster parents and an organization of foster parents sued New York State and New York City officials challenging the constitutionality of procedures governing the removal of foster children from foster homes. The U.S. Supreme Court reversed a lower federal court ruling that the removal procedures were constitutionally defective.

The Court stated:

No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship.

It is one thing to say that individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have freely entered, even in the absence of biological connection or state-law recognition of the relationship. It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right—an interest the foster

parent has recognized by contract from the outset. Whatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents.

*Smith v. Organization of Foster Families, supra*, 431 U.S. at 844–47, 97 S.Ct. at 2109–2111, 53 L.Ed.2d at 35–37.

Based on the foregoing case law and analysis, I conclude that mother's request for the return of her child, less than six months after his birth, and *prior* to the commencement of a relinquishment proceeding, was sufficient to give her substantive parental rights and a fundamental liberty interest under the Fourteenth Amendment.

I am aware that some may contend that the child here also has a constitutionally protected liberty interest in his relationship with the prospective adoptive parents. *See, e.g., In re Clausen*, 442 Mich. 648, 502 N.W.2d 649 (1993) (child's due process liberty interest in family life is not independent of child's parents). The U.S. Supreme Court has expressly declined to determine whether a child born out of wedlock has a liberty interest symmetrical with that of his or her parent. *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Since no constitutional argument has been advanced on behalf of the child here, I do not address that issue.

### B.

In addition to these U.S. Supreme Court cases, three states which have adopted the Uniform Act have recognized the natural parent's fundamental constitutional liberty interests and superior rights to the care, custody, and control of his or her children.

In an Arizona case, the intermediate appellate court refused to apply Arizona's analog to § 14–10–123, Ariz.Rev.Stat.Ann. § 25–331(B)(2). The court there stated:

We can appreciate the court's concern for the welfare of the minor child and its desire to act in his best interest. However, when the state deprives a parent of the fundamental right to raise his child, the

proceedings must be conducted in strict compliance with the statutes involved and under the aegis of the due process and equal protection clauses of the Fourteenth Amendment.... Appellee's concern for the welfare of the child should be directed through the statutory remedies available to her in the juvenile court.

*Webb v. Charles, supra,* 125 Ariz. at 560, 611 P.2d at 565.

Similarly, in *In re Marriage of Pierce,* 198 Mont. 255, 645 P.2d 1353 (1982) the Montana supreme court held that "[I]t is well settled in the law throughout this country, including Montana, that the right of a parent to *custody* of his child is a fundamental constitutional right." It further stated:

Under Montana law it is clear that the only way parental rights can be terminated judicially, absent consent of the biological parents, is under Montana statutes governing child abuse, neglect, or dependency. ... the attempted shortcutting of all Montana statutory and case law governing the legal relationships of parents and children to each other, by using an "executory contract adoption" theory, cannot be approved in *custody cases.*

*In re Marriage of Pierce, supra,* 198 Mont. at 260–61, 645 P.2d at 1356–57. (emphasis added).

Finally, in an Illinois case, that state's supreme court noted that in a custody dispute between a natural parent and a third person, the latter must demonstrate a "compelling reason" why the natural parent should not be granted custody of a child. Relying on U.S. Supreme Court decisions, the Illinois court concluded that "the interest of a parent in the care, custody, and control of his or her child is fundamental and not to be ignored or facilely swept away in the face of a competing petition for custody filed by a third party." *In re Custody of Townsend,* 86 Ill.2d 502, 507–14, 56 Ill.Dec. 685, 688–91, 427 N.E.2d 1231, 1234–37 (1981).

## C.

In addition to these decisions from states adopting the Uniform Act, numerous appellate decisions have relied on the U.S. Su-

preme Court's holding in *Santosky v. Kramer, supra,* that natural parents have a fundamental liberty interest in the care, custody, and management of their children. In *Santosky,* the Supreme Court ruled that a clear and convincing evidence standard must be applied before parental rights could be terminated.

While the majority notes correctly that the *Santosky* decision involves a termination of parental rights, several state court decisions have applied *Santosky* to custody disputes between natural parents and third parties, relying on the significant diminution of parental rights when a third party is awarded permanent custody.

Thus, for example, an Ohio appellate court concluded that an award of permanent custody by that state's probate court "effectively divests the natural parents of all parental rights, privileges and obligations." *In re Adoption of Mays,* 30 Ohio App.3d 195, 198, 30 OBR 338, 341, 507 N.E.2d 453, 456 (1986).

Also, in *Barstad v. Frazier,* 118 Wis.2d 549, 555, 348 N.W.2d 479, 483 (1984), the Wisconsin Supreme Court concluded that: "A change of custody may result in as complete a severance of child-parent ties as does termination. The day to day contact between the child and one having custody can create a relationship that may leave the birth parent almost an intruder. All of the day to day interactions between the parent and child are bound to be diminished if not eliminated where the parent comes on the scene as a court permitted 'visitor.'"

Additionally, a New Jersey court, after noting the constitutional right of natural parents to custody of their children, held that:

Under ordinary circumstances, a custody action by a third party against a natural parent is more like a termination action than a custody action between biological parents. Although visitation may be preserved, such an award destroys any pretense of a normal parent-child relationship and eliminates nearly all of the natural incidence of parenthood including the everyday care and nurturing which are part and parcel of the bond between a parent and child. Thus, normally, when a third

party seeks custody as against a natural parent, the standard should be the termination standard of unfitness.

*Zack v. Fiebert,* 235 N.J.Super. 424, 432, 563 A.2d 58, 63 (1989).

In situations similar to the one presented here, numerous courts have held that there must be a finding of parental unfitness or similar extenuating circumstances before a natural parent can be divested of permanent custody. *See, e.g., Stuhr v. Stuhr,* 240 Neb. 239, 481 N.W.2d 212 (1992). Interestingly, courts applying a constitutional right in these circumstances have relied on the long-standing "parental preference" principle which generally requires a finding of parental unfitness or forfeiture of parental rights before a natural parent can lose custody of his or her child. Indeed, the *Stuhr* court noted that 38 jurisdictions have adopted the "parental preference" principle in child custody disputes. *See Stuhr, supra,* at 240 Neb. at 245, 481 N.W.2d at 216 (citing illustrative decisions).

While older Colorado cases have espoused the "parental preference" doctrine, *see Turner v. Hunter,* 142 Colo. 129, 350 P.2d 202 (1960); *Everett v. Barry,* 127 Colo. 34, 252 P.2d 826 (1953), more recent Colorado decisions have not done so. More recent cases have relied on a "best interest" standard even in the absence of a finding of parental unfitness. *See Abrams v. Connolly,* 781 P.2d 651 (Colo.1989); *In re Marriage of Dureno,* 854 P.2d 1352 (Colo.App.1992). However, none of the more recent Colorado cases upholding custody awards to non-parents has considered a natural parent's constitutional challenge to the award.

Based on the abundance of constitutional law supporting the proposition that a natural parent has a fundamental constitutional liberty interest in the custody, care, and control of his or her child, I believe that § 14–10–123 must be interpreted consistently with those decisions.

I agree with the reasoning of the Kansas Supreme Court in *Sheppard v. Sheppard,* 230 Kan. 146, 630 P.2d 1121 (1981), which found unconstitutional a statute similar to that involved here. Concluding that the statute both destroyed the parental preference doctrine and allowed a third party to take custody of a minor child even though the natural parent is fit, the court concluded that the statute violated the parent's due process rights.

The *Sheppard* court found that the statute did not appear necessary to further the state's interest in protection of children, because the state's juvenile code provisions to protect neglected children and provisions in the civil code to provide for changes in custody sufficed. Additionally, it found that the statute improperly allowed a trial court to determine that the best interests of the child would be served by placing it with third persons, even though the parent might be "perfectly fit, willing, and able to care for and raise the child." *Sheppard v. Sheppard, supra,* 230 Kan. at 152, 630 P.2d at 1127.

In sum, as the Kansas Supreme Court concluded:

> A parent who is not found to be unfit, has a fundamental right, protected by the due process clause of the United States Constitution, to the care, custody and control of his or her child, and that the right of such a parent to the custody of the child cannot be taken away in favor of a third person, absent a finding of unfitness on the part of the parent. We hold that [the Kansas statute] which destroys that fundamental right, is violative of the due process clause and therefore unconstitutional.

*Sheppard v. Sheppard, supra,* 230 Kan. at 154, 630 P.2d at 1128.

Because the trial court here explicitly found that the natural mother was a fit parent, I believe her constitutional rights were violated by the application of a "best interest" of the child standard.

Accordingly, I would reverse the decision of the trial court and award custody to the natural mother.