## No. 79SC83

## Keith Matthews, Barbara Matthews, and Carl B. Runyon v. Tri-County Water Conservancy District

(613 P.2d 889)

Decided July 7, 1980.

Overholser and Slee, John W. Overholser, for petitioners.

Brooks, Miller, Brooks, & White, Ralph E. Miller, John A. Brooks, Theodore L. Brooks, for respondent.

Fairfield and Woods, Charles J. Beise, for amicus curiae, Southeastern Colorado Water Conservancy District.

Baker and Cazier, Stanley W. Cazier, for amicus curiae, Middle Park Water Conservancy District.

Lawrence W. McDaniel, for amicus curiae, Florida Water Conservancy District.

George R. Armstrong, for amicus curiae, Dolores Water Conservancy District.

Sam P. Lockard, Delaney and Balcomb, Kenneth Balcomb, Scott Balcomb, for amicus curiae, Ute Water Conservancy District.

Delaney and Balcomb, Kenneth Balcomb, Scott Balcomb, for amici curiae, Basalt Water Conservancy District, West Divide Water Conservancy District, and Silt Water Conservancy District.

Arthur A. Abplanalp, Jr., for amicus curiae, Board of County Commissioners of Garfield County.

*En Banc.*

JUSTICE LEE delivered the opinion of the Court.

Certiorari was granted to review the decision of the court of appeals in *Matthews v. Tri-County Water Conservancy Dist.,* 42 Colo. App. 80, 594 P.2d 586 (1979).

Petitioners seek to permanently enjoin the Tri-County Water Conservancy District[1] (district) from enforcing a new rate schedule and water tap fee policy. The District Court of Montrose County denied petitioners' motions for injunctive relief, and that action was affirmed on appeal. We now affirm the court of appeals.

The district was organized in·1957 pursuant to the Water Conservancy Act, now in section 37-45-101 *et seq.,* C.R.S. 1973. The district's rules and regulations require subdividers to install water systems in their subdivisions at their cost and to the district's specifications. When a system is completed, it is transferred to the district for operation and maintenance and the district then sells taps to each lot owner within the subdivision.

Petitioners are the owners of two subdivisions in Montrose County. In 1975, they installed a water system in their first subdivision and connected it to the occupied houses. The district rejected the system when, upon inspection, it found that it did not meet specifications. As a temporary solution, the district agreed to sell petitioners a 2-inch commercial tap, which petitioners continue to use.[2] Petitioners then installed a subdivision pipeline system which was fed by the commercial tap, with a meter for each residence. The district billed petitioners at a bulk rate; petitioners in turn billed the owners of the residences for the amount of water used.

At the quarterly meeting of the board of directors of the district on July 27, 1976, the board instructed its executive committee[3] to formulate revised rates and regulations governing commercial taps for trailer parks, apartment houses, condominiums, and subdivisions. The new rates and policies were adopted by the executive committee in August 1976 and approved by the board of directors in October 1976. They provide that commercial taps supplying individual residences will no longer be billed at the commercial bulk rate, but rather that the owner of the commercial tap will be billed according to the number of residences supplied with water from it. Owners of commercial taps will also be billed $500 for each new residence in the subdivision connected to their taps.

Petitioners contend that the new rates and regulations are unlawful and unenforceable. We do not agree.

---

[1] The Tri-County Water Conservancy District serves Ouray, Montrose, and Delta Counties.

[2] Petitioners had also purchased eleven inactive taps in 1973. At that time, it was the policy of the district to assess a minimum charge for inactive taps, although the policy was not implemented until 1976.

[3] The executive committee is composed of two persons from each of the three counties within the boundaries of the district. Those individuals are also members of the district's board of directors.

## I.

Initially, petitioners contend that the new rates and regulations were not validly adopted by the district because only the full board of directors is authorized to act on behalf of the district. Here, petitioners assert that the rates and regulations were established by the executive committee, with the board of directors acting merely as a "rubber stamp."

▇ The board of directors has statutory authority to "fix rates at which water not allotted to lands . . . shall be sold, leased, or otherwise disposed of . . . ." Section 37-45-118(1)(g), C.R.S 1973. *See* section 37-45-118(1)(j), C.R.S. 1973 (1979 Supp.). In this case, the record indicates that the executive committee was acting under the direction of the full board when it formulated the new rules and regulations.

At the July 27, 1976, meeting of the board of directors, the directors discussed active and inactive water tap rates and the problems relating to subdivision water systems. At least one of the petitioners was present at this meeting. It was also at the July 27 meeting that the executive committee was requested to determine new rates and regulations. The committee had the benefit, then, of the discussion, at a public meeting, of the issues it was to address.

Once the executive committee formulated the new rates and regulations, they were submitted to the board for approval and adoption. Thus, it was the board of directors and not the executive committee which "fixed" the new rates. We find no merit in petitioners' contention that the rates and regulations were not properly adopted by the board of directors.

Petitioners further argue that public policy requires that persons affected by decisions of public entities be entitled to have such questions considered at meetings of the entire board, with the opportunity for discussion in that forum. Such an opportunity was afforded members of the public, both at the regular meeting when the executive committee was directed to formulate new rates and regulations and at the quarterly meeting in October 1976 when the new rates and regulations were approved and adopted.

Petitioners also contend that, since the executive committee is an appointive group, aggrieved persons have no recourse to election or recall remedies if they are dissatisfied with the actions of that group. This argument is without merit.

The membership of the board of directors is subject to the elective process if steps are taken by the electors of the district as provided for in section 37-45-114(2), C.R.S. 1973.[4] Thus, if the electorate is dissatisfied with the operation of the district, they may demonstrate their discontent

---

[4] It was stipulated that Tri-County Water Conservancy District was organized in 1957 and, therefore, the alternative provision for election of directors is available.

by exercising their right to initiate the elective process.

## II.

We do not reach the merits of petitioners' position that the board of directors is subject to the State Administrative Procedures Act since petitioners failed to raise this issue in the trial court and are thus precluded from raising it on appeal. C.R.C.P. 59(f).

## III.

Petitioners next contend that the district is a public utility within the meaning of section 40-1-103, C.R.S. 1973, and, therefore, may not set rates and make regulations without first complying with the requirements imposed on a public utility.

We do not agree that water conservancy districts are public utilities subject to the regulation of the Public Utilities Commission (PUC).

The Water Conservancy Act [Act] declares that a water conservancy district shall be a "political subdivision of the state of Colorado and a body corporate with all the powers of a public or municipal corporation." Section 37-45-112(7), C.R.S. 1973. Among the specific powers granted to it is that of fixing water rates at which water "not allotted to lands" shall be sold, leased or otherwise disposed of.

The power of a conservancy district to engage in rate fixing for the sale, leasing or disposition of its waters does not by this authority alone give it public utility status or subject it to the rules, regulations, and supervision of the PUC. More significant is the extent to which the business or enterprise is impressed with the public interest and the extent to which it holds itself out as serving, or ready to serve, *all of the public indiscriminately*. Section 40-1-103, C.R.S. 1973 (statutory definition); *P.U.C. v. Colorado Co.,* 142 Colo. 361, 351 P.2d 241 (1960). *See Robinson v. Boulder,* 190 Colo. 357, 547 P.2d 228 (1976); *Englewood v. Denver,* 123 Colo. 290, 229 P.2d 667 (1951). *See also Parrish v. P.U.C.,* 134 Colo. 192, 301 P.2d 343 (1956).

A municipal corporation which operates as a public utility and limits its services to the inhabitants of the municipality only is not subject to PUC regulation. *Loveland v. PUC,* 195 Colo. 298, 580 P.2d 381 (1978); *K. C. Elec. v. PUC,* 191 Colo. 96, 550 P.2d 871 (1976); *Thornton v. P.U.C.,* 157 Colo. 188, 402 P.2d 194 (1965); *People ex rel. v. Loveland,* 76 Colo. 188, 230 P. 399 (1924); *Compare Schlarb v. Sanitation Dist.,* 144 Colo. 590, 357 P.2d 647 (1960) (sanitation district held not a public utility).

Significantly, the Act provides: ". . . but the sale, leasing, and delivery of water for irrigation and domestic purposes as provided in this section shall only be made *for use within the district*." Section 37-45-118(1)(j). (Emphasis added.) It follows that a water conservancy district, a political subdivision of the state, having the powers of a public or municipal corporation and having no obligation to sell, and being

prohibited by statute from selling water for use outside the district boundaries, does not rationally fall within the definition of a public utility or within the regulatory control of the PUC.

Finally, as the court of appeals noted, the Act was enacted almost twenty-five years after the creation of the PUC. It specifically provides: "All acts or parts of acts conflicting in any way with any of the provisions of this [Act] . . . are declared nonoperative and noneffective as to this [Act] as completely as if they did not exist." Section 37-45-107, C.R.S. 1973.

■ Since the Act specifically grants to the water districts the authority to fix water rates for non-irrigation water, section 37-45-118(1)(g), without any reference to the ratemaking procedure of the PUC, it is clear that the legislature did not intend to make the district's authority to set water rates subject to the jurisdiction of the PUC.

IV.

■ Petitioners argue in the alternative that, even if the district is not subject to the jurisdiction of the PUC, it is subject to the jurisdiction of the board of county commissioners. In support of their argument, they rely on *Colo. Const.* art. XVI, sec. 8, and on article 85 of title 37, C.R.S. 1973, enacted pursuant thereto.

Article XVI, section 8, provides:
"The general assembly shall provide by law that the board of county commissioners in their respective counties, shall have power, when application is made to them by either party interested, to establish reasonable maximum rates to be charged for the use of water, whether furnished by individuals or corporations."

To implement this constitutional provision, the General Assembly enacted article 85 of title 37, C.R.S. 1973, which provides procedures by which the boards of county commissioners may establish reasonable maximum rates for water.

The question is whether section 8 of article XVI of the constitution and the statute implementing it have application to water conservancy districts, which the General Assembly has denominated "political subdivisions of the state of Colorado." Section 37-45-112(7), C.R.S. 1973.

Section 8 of article XVI of the Colorado Constitution concerns reasonable maximum rates to be charged for the use of water whether furnished by "individuals or corporations." Section 37-85-101 of the implementing statute provides that "persons" as used in article 85 shall include "corporations and associations."

Section 37-85-103 provides:
"The board of county commissioners of each county, at its regular sessions in each year, and at such other sessions as it in its discretion may deem proper, in view of the irrigation and harvesting season, and the convenience of all parties interested, shall hear and consider all

applications which may be made to it by any party interested, *either in furnishing and delivering for compensation in any manner, or in procuring for such compensation,* water for irrigation, mining, milling, manufacturing, or domestic purposes, from any ditch, canal, conduit, or reservoir, the whole or any part of which lies in such county. The application shall be supported by such affidavits as the applicant may present, showing reasonable cause for such board of county commissioners to proceed *to fix a reasonable maximum rate of compensation* for water to be thereafter delivered from such ditch, canal, conduit, or reservoir, within such county." (Emphasis added.)

Subsection (1) of section 37-85-106 requires the board of commissioners to hear and examine testimony concerning the "original cost and present value of works and structure of such ditch, canal, conduit, or reservoir, the cost and expense of maintaining and operating the same, and all matters which may affect the establishing of a *reasonable maximum rate of compensation* for water to be furnished and delivered therefrom." (Emphasis added.) Subsection (2) speaks also in terms of fixing a "just and reasonable maximum rate of compensation for water" to be delivered from such ditch or other work within the county.

Sections 37-85-109 and 110 provide criminal sanctions for collecting excessive rates and for refusing to deliver water.

Finally, section 37-85-111 provides for proceedings in the nature of quo warranto for the forfeiture of corporate rights, privileges and franchises for any corporate defiance or attempted evasion of the provisions of article 85.

It is our view that the language of section 8 of article XVI of the Colorado Constitution and of article 85 of title 37 is not applicable to a "political subdivision of the state of Colorado." Rather, it is our opinion that the framers intended, and the General Assembly understood, that the constitutional provision was applicable only to private persons or corporations engaged in the business of storage, carriage, and sale of water for "irrigation, mining, milling, manufacturing, or domestic purposes."[5] Section 37-85-103.

We find persuasive the following language in the landmark case of *Wheeler v. Northern Colorado I. Co.,* 10 Colo. 582, 17 P. 487 (1887), the first case involving the interpretation of the constitutional provision and the implementing statute:

---

[5] The statutory terms "original cost and present value of works," "cost and expense of maintenance and operating the same," and "reasonable maximum rate of compensation," connote a business enterprise wherein a reasonable rate of return is essential to the protection of a capital investment. Such terms ordinarily do not apply to the functioning of a political subdivision of the state.

For convenience I [Mr. Justice Helm] shall, throughout this opinion, use the terms 'carrier' and 'consumer,' meaning the canal company and the tiller of the soil respectively.

"The agriculturists in the territory mentioned are, with few exceptions, unable to convey water from the natural streams to their land. The annual rainfall is increasing; yet at present, without irrigation, but a small fraction of the producing capacity of the soil can be utilized, and, unaided, these consumers will for years to come be practically helpless. To the successful cultivation of that region the carrier and consumer are, therefore, equally indispensable. Hence a wise legislative policy and an intelligent judicial construction require a careful consideration of the privileges, powers and duties of the carrier, as well as the rights and obligations of the consumer. The courts should protect the consumer in the full enjoyment of his constitutional and statutory rights; but they should also jealously guard the rights of the carrier; and so deal with it (the constitution and statutes permitting) *as to encourage the investment of capital in the construction of reservoirs and canals for the storage and transportation of water.* (Emphasis added.)

. . . .

"The constitution unquestionably contemplates and sanctions *the business of transporting water for hire* from natural streams to distant consumers . . . . (Emphasis added.)

. . . .

"By section 8, article XVI, of the constitution, from which the foregoing phrase is taken, the convention recognized *the carrier's right to compensation for transporting water,* and provided for a judicial, or *quasi*-judicial, tribunal to fix an equitable maximum charge where the parties fail to agree. It requires no citation of authority to show that the words 'purchase' or 'sale,' together with other words of like import, used in this connection by the legislature, must receive a corresponding interpretation. Under the constitution, as I understand it, the carrier is at least a *quasi*-public servant or agent. It is not the attitude of a private individual contracting for the sale or use of his private property. It exists largely for the benefit of others; *being engaged in the business of transporting, for hire, water owned by the public,* to the people owning the right to its use. It is permitted to acquire certain rights as against those subsequently diverting water from the same natural stream. It may exercise the power of eminent domain. *Its business is affirmatively sanctioned, and its profits or emoluments are fairly quaranteed* [sic]. But in consideration of this express recognition, together with the privileges and protection thus given, it is, for the public good, charged with certain duties and subjected to a reasonable control. (Emphasis added.)

. . . .

"But the constitution is not silent in the particular mentioned. It evinces, beyond question, a purpose to subject *this, as other branches of the business,* to a certain degree of public control. . . ." (Emphasis added.)[6]

Further fortifying our belief that the General Assembly understood that section 8 of article XIV of the Colorado Constitution was intended by the framers to apply only to persons and corporations, and not to "political subdivisions," was the inclusion in the statute of the penal sanctions found in sections 37-85-109, 110, and 111. Such are inappropriate to "political subdivisions."

We do not suggest, however, that water conservancy districts are without constraints in the fixing of rates for the sale of water. Section 37-45-118(1)(g), C.R.S. 1973, mandates that ". . . rates shall be equitable although not necessarily equal or uniform, for like classes of service throughout the district."[7]

We conclude that water conservancy districts, when fixing rates for sale of water, are not subject to the jurisdiction of the boards of the county commissioners.

## V.

Finally, petitioners argue that the district's enforcement of the revised rates and regulations deprives them of their constitutional rights. We have reviewed their arguments and agree with the discussion and resolution of this issue by the court of appeals. We deem it unnecessary to further

---

[6] The following are all of the cases found concerning the application of section 37-85-101, *et seq.,* C.R.S. 1973. None involved a "political subdivision" as a party.

*Golden Canal Co. v. Bright,* 8 Colo. 144, 6 P. 142 (1884). Plaintiff was a landowner; defendant was a corporation which constructed, owned, and maintained irrigation ditches.

*S.B. & R.C.D. Co. v. Marfell,* 15 Colo. 302, 25 P. 504 (1890). Plaintiffs were consumers; defendant was a private water carrier.

*Denver v. Walker,* 45 Colo. 387, 101 P. 348 (1909). Plaintiffs were property owners receiving water from a city-owned irrigation ditch; defendant was the city.

*Montezuma W. & L. Co. v. McCracken,* 62 Colo. 394, 163 P. 286 (1917). Plaintiff was owner of irrigation canal which was subject to rates set by board of county commissioners. Defendant was landowner.

*Wanamaker Co. v. Pettit,* 89 Colo. 344, 3 P.2d 295 (1931). Plaintiff owned irrigation ditch; defendant was a user of the water.

*Northern Co. v. Commissioners,* 95 Colo. 555, 38 P.2d 889 (1934). Plaintiff was owner of an irrigation ditch; the city and county of Denver acquired all of the shares of the corporation. Individual water users and various boards of county commissioners were defendants.

*Farmers Co. v. Barrett,* 151 Colo. 140, 376 P.2d 693 (1962). Plaintiff was a private ditch company incorporated by certain water users; defendant was the board of county commissioners.

*Northern Co. v. Pouppirt,* 22 Colo. App. 563, 127 P. 125 (1912). Plaintiff was property owner; defendant was a Colorado corporation which owned and operated an irrigation ditch.

*Zoller v. Mail Crk. Ditch Co.,* 31 Colo. App. 99, 498 P.2d 1169 (1972). Plaintiffs were stockholders in defendant corporation, a "mutual ditch corporation."

*Pioneer Irr. Co. v. Board of Com'rs,* 251 F. 264 (8th Cir. 1918). Plaintiff was a private company seeking to restrain enforcement of rate fixed by board of county commissioners for use of irrigation water.

[7] In case of a substantial departure from that standard in the fixing of rates, a water conservancy district may be subject to restraint through appropriate judicial proceedings.

articulate our reasons for the conclusion that petitioners' constitutional contentions do not have merit.

Accordingly, we affirm the court of appeals.