**Bruce MILLER and The Cloud Base, Inc., Plaintiffs–Appellees and Cross–Appellants,**

v.

**Thomas BYRNE, William White, individually and d/b/a Byrne, Kiely & White, a Colorado Partnership and Southern Aviation Insurance Group, Inc., Defendants–Appellants and Cross–Appellees.**

**Nos. 93CA1157, 93CA1880.**

Colorado Court of Appeals, Div. II.

Aug. 24, 1995.

As Modified on Denial of Rehearing Oct. 5, 1995.

Certiorari Denied May 20, 1996.

Quiat, Schlueter, Mahoney, Ross & Barber, Laurin D. Quiat, William J. Barber, Denver, Meyer & Williams, P. Richard Meyer, Robert N. Williams, Jackson, WY, for plaintiffs-appellees and cross-appellants.

Cooper & Kelley, P.C., Paul D. Cooper, Ronald H. Nemirow, John R. Mann, Denver, for defendants-appellants and cross-appellees Thomas Byrne, William White and Byrne, Kiely & White, on the briefs.

Cooper & Clough, P.C., Paul D. Cooper, Rebecca L. Crotty, Denver, for defendants-appellants and cross-appellees Thomas Byrne, William White and Byrne, Kiely & White.

Cooling & Herbers, P.C., Thomas J. Morris, Denver, Cooling & Herbers, P.C., James E. Cooling, Kansas City, MO, for defendant-appellant and cross-appellee Southern Aviation Ins. Group.

Opinion by Judge CASEBOLT.

In this action for bad faith breach of insurance contract, legal malpractice, and breach of fiduciary duty, defendants, Southern Aviation Insurance Group, Inc., (Southern) and Thomas Byrne, William White, and Byrne, Kiely & White (Attorneys), appeal the judgment entered in favor of plaintiffs, The Cloud Base, Inc., (Cloud Base) and its owner, Bruce Miller. Cloud Base and Miller cross-appeal certain rulings of the trial court. We affirm in part, reverse in part, and remand for a new trial.

On April 2, 1988, a passenger on a sightseeing glider flight near Boulder, Colorado, was killed when the glider, which was owned and operated by Cloud Base, crashed. The passenger, a Wyoming resident, was survived by his spouse and two minor children.

At the time of the crash, Cloud Base had liability insurance coverage from Ohio General Insurance Company. Southern was a managing general agent for that carrier. The insurance coverage provided $100,000 in policy limits for any damages for which Cloud Base was responsible.

Southern investigated the cause of the crash. A number of potential causes were identified, including weather conditions, a product defect in the aircraft, pilot error, and possible interference with the glider controls by the passenger.

As part of its investigation, Southern's representative met with the passenger's widow to inform her of the policy coverage and to discuss the crash. At about the same time, the representative discussed the matter with Lisa Sweeney, an attorney representing the widow.

In the summer of 1988, Southern's representative hired the Attorneys to examine liability issues and defend Cloud Base should a lawsuit be filed. Cloud Base retained additional personal counsel. Cloud Base and Miller requested that payment of the policy limits in settlement to the passenger's widow be made if such a settlement offer was received. Southern's representative made a structured settlement offer with a present value of approximately $80,000 to the widow. This offer was not accepted.

Thereafter, Southern's representative and the Attorneys corresponded with Meyer & Williams, another group of attorneys who represented the widow. However, on April 5, 1989, Southern's representative received a letter dated March 28, 1989, from Sweeney, which contained an offer to settle the claim for the policy limits of $100,000. The offer expired by its terms on April 9, 1989. Southern's representative immediately sent a copy by facsimile to the Attorneys and discussed its contents with them.

Southern's representative instructed the Attorneys to seek clarification concerning the offer from Sweeney; however, telephone calls to Sweeney by the Attorneys were not returned. Southern was willing to pay $95,000 in settlement, but not the full limits. Without the direction of Southern's representative, by letter dated April 7, 1989, the Attorneys rejected the settlement offer. No offer of $95,000 was made.

Cloud Base and Miller were not notified by Southern or by the Attorneys of this offer or its rejection until early May of 1989. According to Miller's testimony, either he or Cloud Base would have been willing to pay the balance of $5,000 to add to the authority of $95,000 granted by Southern, had they been aware of the offer.

Thereafter, the passenger's widow was appointed personal representative for her husband's Wyoming estate. As authorized by Wyoming law, she then commenced, through attorneys Meyer & Williams, a suit for wrongful death against Cloud Base and Miller. Upon learning of the suit and receiving authority from Southern, the Attorneys sent an offer to pay the $100,000 policy limits to settle the case to Meyer & Williams. The offer was rejected.

The insurance carrier, Ohio General, went into liquidation in spring of 1990. The Attorneys defended Cloud Base and Miller in the wrongful death action until the fall of 1990. The Attorneys then sought and obtained permission to withdraw as counsel for Cloud Base and Miller.

Thereafter, Cloud Base, Miller, and the passenger's widow negotiated a settlement of the wrongful death claim, wherein Cloud Base and Miller confessed judgment in the amount of $1.2 million and assigned 98 percent of any claim they had against Ohio General, Southern, and the Attorneys to the passenger's widow, in return for a covenant not to execute against Cloud Base and Miller.

This action for breach of fiduciary duty and legal malpractice against the Attorneys and a claim against Southern for bad faith breach of insurance contract was commenced in May 1991. Cloud Base and Miller contended, *inter alia*, that the Attorneys were negligent and had breached their fiduciary duty by wrongfully rejecting the settlement offer and by failing to advise them of the policy limits settlement offer tendered by the passenger's widow. In addition, Cloud Base and Miller alleged that Southern had unreasonably breached the insurance contract by failing to settle the underlying suit for the policy limits.

Southern and the Attorneys designated Sweeney and, later, Meyer & Williams as non-parties at fault pursuant to § 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A). They contended that Sweeney had orchestrated a vague and sham settlement offer, that she had wrongfully declined to return telephone messages left by the Attorneys seeking clarification and details concerning the settlement offer, and that she and Meyer & Williams had concocted a scheme to "set up" Southern for a bad faith claim by, among other things, intentionally imposing an unreasonably short deadline for the offer.

As to Meyer & Williams, the Attorneys additionally contended that they had failed to reveal that Sweeney was their co-counsel, had failed to coordinate settlement negotiations with her, and had failed to advise the passenger's widow to accept the policy limits offer made in May 1989, after the wrongful death suit was initiated.

The trial court dismissed the negligence claim against the Attorneys as barred by the statute of limitations but allowed presentation of the breach of fiduciary duty claim.

On the first day of trial, the trial court struck the designation of both Sweeney and Meyer & Williams as nonparties at fault. Consequently, the alleged "fault" of these designated persons was not considered by the jury.

After a jury trial, judgment was entered against Southern and the Attorneys, jointly and severally, for $705,000. The jury awarded $200,000 damages for emotional distress against Southern only. This appeal followed.

## I.

■ Southern first argues that the trial court erred by assertedly refusing to follow the pattern jury instructions contained in *CJI–Civ.3d* 25:1, et seq. (1988) concerning the claim for bad faith breach of the insurance contract. In addition, it contends that the instructions given the jury: (1) were inadequate because they incorrectly used and failed to define the phrase "bad faith"; (2) created prejudicial assumptions by instructing the jury to assume that "bad faith" existed simply if a settlement did not occur; and

3) did not direct the jury to consider the issues of damage, conduct, and causation in one instruction. We agree in part. .

The jury instructions given for the "bad faith" claim read as follows:

### Instruction No. 2

. . . .

Miller contends that Southern Aviation and [its investigator] exercised "bad faith" in failing to settle [the widow's] claims against Miller within policy limits.

Southern Aviation and [its investigator] deny they acted in "bad faith" towards Miller in failing to settle the claim and deny that their conduct caused damages to Miller.

. . . .

### Instruction No. 13

Southern Aviation owes to Miller the duty of good faith and fair dealing. That duty is breached if the company fails to attempt to settle within the policy limits without a reasonable basis.

. . . .

### Instruction No. 17

To award any actual damages, you must find by a preponderance of the evidence that the plaintiff incurred actual damages caused by the claimed bad faith breach of a contract of insurance.

No "carrying" instruction delineating the elements of a "bad faith" claim was given. The special verdict form asked the jury to determine whether Southern "exercised 'bad faith' in failing to settle [the widow's] claims against Miller within policy limits," and whether Miller incurred "damages as a result of Southern Aviation's bad faith breach of insurance contract."

*CJI–Civ.3d* 25:1 (1988) describing bad faith breach of an insurance contract states:

In order for the plaintiff to recover from the defendant on [the] claim of unreasonable breach of an insurance contract, you must find all of the following have been proved:

1. The plaintiff incurred (damages);

2. The defendant acted unreasonably in (insert appropriate description, e.g., failing to settle the claim [name of third party] had made against the plaintiff); and

3. The defendant's unreasonable (conduct) (position) was a cause of the plaintiff's (damages).

If you find that any one or more of these (number) propositions has not been proved by a preponderance of the evidence, then your verdict must be for the defendant.

On the other hand, if you find that all of these (number) propositions have been proved by a preponderance of the evidence, then your verdict must be for the plaintiff (unless you also find that the defendant's affirmative defense of [insert any affirmative defense that would be a complete defense to the plaintiff's claim] has been proved by a preponderance of the evidence, in which event, your verdict must be for the defendant).

*CJI–Civ.3d* 25:3 (1988) defines unreasonable conduct or position as follows:

(Unreasonable conduct means the failure to do an act which a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances, to protect the person insured from [damages] ).

(Unreasonable position means a position taken by an insurance company with respect to a claim being made on one of its policies which a reasonably careful person would not take under the same or similar circumstances.)

*See also* § 10–3–1113, C.R.S. (1994 Repl.Vol. 4A) (jury may be instructed that insurer owes insured the duty of good faith and fair dealing, which duty is breached if the insurer delays or denies payment without a reasonable basis).

Southern contends that the instructions given incorrectly used and failed to define appropriately the phrase "bad faith." We agree that the instructions failed to set forth the appropriate standard with which to mea-

sure Southern's conduct and, consequently, that a new trial must be granted.

In reviewing the record, we find no definition, comparable to that set forth in *CJI–Civ.3d* 25:3 (1988), that explains the standard by which the jury is to measure Southern's conduct and determine the existence of "bad faith" or unreasonableness. *See Armentrout v. FMC Corp.*, 842 P.2d 175 (Colo.1992). Absent such an instruction, the jury may have supplied its own definition of reasonable conduct and measured Southern's actions by an unknown yardstick.

In *Armentrout v. FMC Corp., supra,* the supreme court determined, in part, that the failure to define the word "defective" in instructions given in a product liability case necessitated a new trial. In doing so, it noted that the use of the term throughout the trial in testimony and exhibits would not allow the jury to glean the term's meaning and that the appropriate test is whether the instructions, as a whole, correctly and adequately set forth the applicable law.

Here, Southern appropriately objected that the instructions as given did not define the standard of reasonableness. The trial court instructed the jury to determine whether Southern exercised "bad faith," and whether Miller incurred damages as a result of that "bad faith." That term was not defined in the instructions; rather, the jury was informed that Southern owed a duty of "good faith and fair dealing" that was breached if Southern failed to attempt to settle "without a reasonable basis."

While "bad faith" was inferentially defined as a failure to settle the claim without a reasonable basis, "reasonableness" under the circumstances was not defined. Without a definition of that concept, we cannot determine to what extent the jury applied its own definition, or was misled. *See Mile Hi Concrete, Inc. v. Matz,* 842 P.2d 198 (Colo.1992).

■ The standard of care applicable to a defendant's conduct is an integral part of the instructions. *See United Blood Services, Inc. v. Quintana,* 827 P.2d 509 (Colo.1992) (determination of appropriate standard of care instruction to be applied by jury is necessary for proper instruction); *Federal Insurance Co. v. Public Service Co.,* 194 Colo. 107, 570 P.2d 239 (1977) (failure to give instruction correctly defining appropriate standard of care constitutes reversible error).

Further, the notes on use to *CJI–Civ.3d* 25:1 direct that an appropriate definition should be given to define the standard of unreasonable conduct or unreasonable position. As well, the pattern jury instructions do not use the term "bad faith" in outlining the elements of liability or the appropriate standard of conduct. The seminal case involving this tort, *Farmers Group v. Trimble,* 691 P.2d 1138 (Colo.1988), likewise directs consideration of the reasonableness of conduct under the circumstances, recognizing that the standard of conduct must be characterized by general principles of negligence. In recognition of that fact, the court there further noted that the assertion of separate claims in the complaint for "bad faith" and negligence was inappropriate. *See also* § 10–3–1113, C.R.S. (1994 Repl.Vol. 4A) (the determination of whether the insurer's delay or denial was reasonable shall be based on principles of negligence).

Furthermore, no "carrying" instruction was given that defined the elements of the claim and directed the jury that *each* component must be proven before a verdict for the plaintiff could be returned, nor that a failure to prove any one element required a verdict for Southern. *See CJI–Civ.3d* (1988) (General Directions for Use) (in every case, an instruction shall be given stating the elements necessary to be established to entitle a party seeking relief to a favorable verdict or to establish affirmative defenses).

Accordingly, we conclude that retrial is necessary. On retrial, the trial court should utilize, as applicable to the facts and evidence, those instructions set forth in *CJI–Civ.3d* 25:1, 25:3, 25:5, and 25:6 (1988) concerning the tort of unreasonable breach of insurance contract and the damages therefor. *See* C.R.C.P. 51.1.

In view of this conclusion, we need not address Southern's remaining contentions concerning instructional error as those asserted errors are unlikely to arise on retrial.

## II.

The Attorneys assert that the trial court erred in rejecting their tendered instructions that would have required the jury to find first that the settlement offer from Sweeney was genuine before determining whether they breached their fiduciary duty by failing to communicate the offer. Southern joins in this argument by asserting that the settlement offer had to be bona fide before the jury could determine whether it unreasonably breached the insurance contract by failing to settle. Both the Attorneys and Southern further contend that, in any event, the trial court erred in prohibiting the introduction of evidence concerning the genuineness of the settlement offer.

■ While we disagree that the genuineness and bona fides of an offer are required elements for proof of the claims asserted, we do agree that some evidence concerning the form and contents of the settlement offer, as set forth below, was relevant and admissible for other reasons.

### A.

■ An attorney representing a client has an obligation to advise the client fully of settlement negotiations and their ramifications. *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58 (1989); *Whiteaker v. State*, 382 N.W.2d 112 (Iowa 1986); *Joos v. Auto–Owners Insurance Co.*, 94 Mich.App. 419, 288 N.W.2d 443 (1979). *See Kunz v. Warren*, 725 P.2d 794 (Colo.App.1986) (to discharge fiduciary duty to the principal, an agent must disclose all facts relative to the subject matter of the agency which might reasonably affect the decisions of the principal); R. Mallen & J. Smith, *Legal Malpractice* § 24.36 (1989). *See also Colorado Rules of Professional Conduct* 1.4 (A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information); *Colorado Rules of Professional Conduct* 1.4 (Committee Comment) ("[A] lawyer negotiating on behalf of a client should ... inform the client of communications from another party....")

■ Moreover, this duty to communicate all settlement offers exists even when an insurance company retains the attorney to defend an action against its insured, because the insured is, nevertheless, a client. *Rogers v. Robson, Masters, Ryan, Brumund & Belom*, 81 Ill.2d 201, 40 Ill.Dec. 816, 407 N.E.2d 47 (1980). Accordingly, the insured must be notified of any pending settlement negotiations. *Lysick v. Walcom*, 258 Cal.App.2d 136, 65 Cal.Rptr. 406 (1968); R. Mallen & J. Smith, *Legal Malpractice* § 23.21 (1989). This allows the insured to take appropriate actions to protect his or her own interests. *See* R. Mallen, *Insurance Counsel: The Fine Line Between Professional Responsibility and Malpractice*, 45 Ins. Counsel J. 244, (1978).

■ Southern and the Attorneys assert that the trial court deprived them of the opportunity to demonstrate that the settlement offer from Sweeney was bogus and was made as part of a deliberate scheme to "set up" Southern and Ohio General for a subsequent bad faith claim. We conclude that the trial court properly ruled that the Attorneys had a duty to advise their clients of settlement negotiations and their ramifications regardless of whether they were bona fide.

The Attorneys rely on *Baton v. Transamerica Insurance Co.*, 584 F.2d 907 (9th Cir.1978) and other out-of-state cases for the proposition that an insurance company and the attorney it hires to represent its insured have no duty to respond to or inform the insured about settlement offers which are ambiguous or not genuine. We disagree with that proposition.

The cited cases are not the law in Colorado, nor do we perceive any compelling reason to adopt the rationale they utilize. As to the breach of fiduciary duty claim against the Attorneys, any ambiguity in the offer of settlement would constitute one of the facts that should be disclosed relative to the subject matter of the agency. *See Kunz v. Warren, supra.* Lack of "genuineness" is not, however, a complete defense in itself to a breach of fiduciary duty claim, nor is "genuineness" an element of proof for a plaintiff in presenting such a claim.

Hence, the trial court properly refused to instruct the jury that the settlement offer

had to be bona fide before any duty to communicate it arose. Correspondingly, the instruction given by the trial court that the Attorneys owed the duty to advise Miller and Cloud Base fully of settlement negotiations and their ramifications was proper.

We specifically note, however, that we are not asked to address and do not decide whether the failure of an attorney to communicate a settlement offer to a client who may have no power of acceptance, *i.e.*, no ability to take action personally to settle the case, gives rise to a negligence or breach of fiduciary duty claim.

### B.

■ As to Southern's contention that *Baton v. Transamerica Insurance Co., supra,* is applicable to the bad faith claim asserted against it, we likewise reject that contention. Whether the offer was "bona fide" is not an *element* of the tort of unreasonable breach of an insurance contract in Colorado. *See Farmers Group, Inc. v. Trimble, supra.* Hence, on retrial the trial court need not require the jury to find that there was a bona fide offer as a part of the elements of liability for the claim of unreasonable breach of insurance contract.

### C.

■ We do, however, agree that evidence concerning the contents of the offer, its form, and any defects which affected the ability to accept it were relevant and admissible.

Here, Sweeney's offer to settle the wrongful death claim for policy limits of $100,000 recited that Sweeney represented the widow and her family. However, according to the record, under Wyoming law a wrongful death action could be brought only by the personal representative of a decedent's estate. Furthermore, the decedent's brother and father were also possible claimants and were not represented by Sweeney.

Additionally, the settlement letter stated that the offer expired on "Friday, April 9" when in fact Friday of that week was on April 7.

Finally, the Attorney's telephone calls to Sweeney on April 5 and 6, allegedly seeking clarification of the terms of the offer, were not returned.

Under CRE 401, proffered evidence must relate to a fact "that is of consequence to the determination of the action." In essence, the evidence must be legally material to some factual issue in the case. *Pennington v. Sears, Roebuck & Co.,* 878 P.2d 152 (Colo. App.1994).

■ If the proffered evidence is legally material, its admissibility becomes dependent on whether the evidence has any tendency to make the existence of a consequential fact more probable or less probable than it would be without the evidence, *i.e.*, it must be logically relevant. *People v. Carlson,* 712 P.2d 1018 (Colo.1986).

■ In analyzing whether evidence relates to a fact of consequence, the elements of the claim for relief must be examined. *Pennington v. Sears, Roebuck & Co., supra.*

To prove a claim for breach of fiduciary duty a plaintiff must demonstrate, *inter alia,* that he or she has incurred damages and that the defendant's breach of fiduciary duty was a cause of the damages sustained. *Rupert v. Clayton Brokerage,* 737 P.2d 1106 (Colo. 1987).

To rebut such proof in the context of this case, the Attorneys would be entitled to show, among other things, that the offer could not have been effectively accepted without clarification because its terms were ambiguous or did not properly identify the parties that would be bound by any settlement contract created, or that communication of an acceptance would have been impossible. Such evidence is relevant and admissible because, absent proof that the settlement offer would have been accepted and would have resulted in an enforceable contract, Miller and Cloud Base would be unable to prove that conduct of the Attorneys caused damages, or even that any damages were in fact incurred. *See* CRE 401, 402.

Similarly, the evidence would be admissible to establish that Southern's conduct was reasonable or, alternatively, that its conduct,

even if unreasonable, was not a cause of any damages sustained by Miller and Cloud Base. *See Farmers Group v. Trimble, supra.*

■ Consequently, on retrial, such evidence should be admitted for the purposes noted. Contrary to the contentions of the Attorneys and Southern, however, the *motivation* or *intent* of Sweeney to "set up" Southern or the Attorneys for a bad faith claim does not, on this record, appear to meet the tests of legal materiality or logical relevance.

### III.

The Attorneys and Southern next argue that the trial court erred in striking their designation of Sweeney and Meyer & Williams as nonparties-at-fault. Specifically, they argue that the trial court erred in striking these nonparties on the basis that such parties owed no duty to Miller and Cloud Base. We do not agree, and thus, that ruling may stand for purposes of retrial.

■ The General Assembly has provided that part of the total liability for damages to a plaintiff may be apportioned to nonparties who may be partially or wholly at fault for a plaintiff's injuries. *Moody v. A.G. Edwards & Sons, Inc.*, 847 P.2d 215 (Colo.App.1992).

Section 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A) states, in relevant part:

(1) In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage or loss, except as provided in subsection (4) of this section.

(2) The jury shall return a special verdict ... determining the percentage of negligence or fault attributable to each of the parties and any persons not parties to the action of whom notice has been given ... to whom some negligence or fault is found and determining the total amount of damages sustained by each claimant....

(3)(a) Any provision of the law to the contrary notwithstanding, the finder of fact in

a civil action may consider the degree or percentage of negligence or fault of a person not a party to the action, based upon evidence thereof, which shall be admissible, in determining the degree or percentage of negligence or fault of those persons who are parties to such action....

The statute speaks in terms of allocation of "fault" or "negligence" without specifically defining either term. More importantly, the statute directs that a determination shall be made concerning the degree of fault or negligence "attributable" to a defendant that "produced" the injury and requires that there be a determination of the percentage of negligence or fault "attributable to each of the parties and any persons not parties ... to whom some negligence or fault is found".

The terms "attributable" and "produced" are not defined in the statute. The statute does not indicate whether the fault or negligence of a nonparty to be examined must be "attributable" in a technical, legal sense, or whether the "fault" of any person or entity that may have even remotely acted should be measured, regardless of whether that nonparty could be sued by the plaintiff. Stated differently, the statute does not determine whether a nonparty must have a duty to the plaintiff or whether fault may be measured even if there is no such duty.

No appellate court in Colorado has previously addressed the issue whether a designated nonparty must owe a duty to the injured plaintiff in order for designation to be proper. Hence, our determination of that issue must be guided by principles of statutory construction and review of available case law.

■ In construing statutes, we give effect to the intent of the General Assembly by looking first at the plain language of the statute. *Moody v. Corsentino*, 843 P.2d 1355 (Colo.1993). To effectuate legislative intent, we must give statutory terminology its commonly accepted meaning. *Boulder County Board of Equalization v. M.D.C. Construction Co.*, 830 P.2d 975 (Colo.1992). A strained or forced construction of a statutory term is to be avoided, and we must look to

the context of a statutory term. *State v. Hartsough,* 790 P.2d 836 (Colo.1990).

■ Moreover, terms should be construed in harmony with one another so as to give full effect to the legislative intent in enacting the statute. *McCarty v. People,* 874 P.2d 394 (Colo.1994).

We construe the term "attributable" in the statute to mean assignable, ascribable, or imputable in the sense of an *obligation* or duty. We do so for a number of reasons.

■ First, we note that the nonparty-at-fault statute has been integrated with the Uniform Contribution Among Tortfeasors Act, § 13–50.5–101, et seq., C.R.S. (1987 Repl.Vol. 6A), such that a defendant has a right to seek contribution from a joint tortfeasor for the amount the defendant pays in excess of his or her pro rata share of liability for the same injury rendered to the plaintiff. *See Graber v. Westaway,* 809 P.2d 1126 (Colo.App.1991). This assumes that the joint tortfeasor owes a duty to the plaintiff; otherwise, a plaintiff would not be able to recover from the joint tortfeasor in the first instance.

Second, if a defendant is limited to designating a person or entity who owes the plaintiff a duty, the plaintiff may respond to the designation by amending his or her complaint to add the designated party as a defendant. *See Thompson v. Colorado & Eastern R.R. Co.,* 852 P.2d 1328 (Colo.App.1993) (requiring strict compliance with the statute in order for designation to be proper avoids a situation in which a named defendant reduces its liability by blaming a nonparty but a plaintiff does not have the chance to recoup that percentage of fault from the nonparty). Absent the existence of a duty, an injured plaintiff may not assert a claim for relief against the alleged tortfeasor.

If unlimited designation of nonparties were to be allowed, without some duty limitation, it would be relatively simple for a defending party to identify remote nonparties that have "produced" an injury to the plaintiff in the sense of being a "but-for" cause of the harm. A classic situation would be the law school example of a person drowning in a lake, while bystanders took no action to assist. A would-be rescuer who worsens the predica-

ment of the drowning person would be held to owe a duty of care to that person, whereas the bystanders who took no action would not. If a later action against the would-be rescuer was pursued, all of the bystanders might be considered "negligent" or "at fault" and thus subject to designation, because "but-for" their inaction, the drowning person might not have sustained injury. However, none would be legally liable because no duty would likely be found to exist.

Third, we perceive that the terms "negligence" and "fault" as used in the statute connote a potential legal liability by the nonparty to the injured plaintiff. Such is the ordinary meaning ascribed to those terms. "Negligence" requires the existence of a duty, a breach of that duty, causation, and damages. *Observatory Corp. v. Daly,* 780 P.2d 462 (Colo.1989). The term "fault" is broader than "negligence," but likewise implies legal responsibility. *See O'Quinn v. Wedco Technology, Inc.,* 746 F.Supp. 38 (D.Colo.1990).

Fourth, we recognize that the supreme court has indicated that nonparties who are immune because of the statutory bar of the Workers' Compensation Act may nevertheless be designated as nonparties at fault, *see Williams v. White Mountain Construction Co.,* 749 P.2d 423 (Colo.1988) *(dicta),* and entities that are immune because of sovereign immunity have been held to be subject to designation. *See In re Air Crash Disaster at Stapleton Intern. Airport,* 720 F.Supp. 1465 (D.Colo.1989). However, in these cases, the fact remains that the nonliable entities have general duties of care toward injured parties. They are, however, for statutory, common law, or appropriate policy reasons, rendered immune. *See generally* Stiegelmeier, *Designation of Immune, Nonliable & Unknown Nonparties,* 22 Colo.Law. 31 (January 1993). *See also Canape v. Petersen,* 897 P.2d 762 (Colo.1995) (employer's duty at common law to employee was to exercise reasonable care).

Finally, this approach harmonizes the competing theories behind the statute. Under our analysis, a plaintiff may join the designated nonparty (if not immune). Further, a defendant will still only be "liable" for such

defendant's share of the whole "liability" because it shoulders only the amount of negligence or fault that properly "belongs" to it, while designated nonparties who owe a duty and but for immunity would be "liable" to the plaintiff are charged with the balance. *See* Stiegelmeier, *Designation of Immune, Nonliable and Unknown Nonparties, supra;* Benson, *New Role for Nonparties in Tort Actions—The Empty Chair,* 15 Colo.Law. 1650 (September 1986).

■ A duty of care for purposes of analyzing negligence claims arises when there is a foreseeable risk of injury to others from a person's failure to take protective action to prevent the injury. *Connes v. Molalla Transport System, Inc.,* 831 P.2d 1316 (Colo. 1992). Foreseeability is a prime factor in the duty calculus, as is the social utility of the nonparty's conduct, the magnitude of the burden of guarding against the harm caused to the plaintiff, the practical consequences of placing such a burden on the actor, and any additional elements disclosed by the particular circumstances of the case. *See Observatory Corp. v. Daly, supra; University of Denver v. Whitlock,* 744 P.2d 54 (Colo.1987). We conclude that this analysis provides an appropriate analytical framework for determining the propriety of designation of nonparties at fault.

■ Consequently, we hold that, generally, the person or entity designated under § 13–21–111.5 must, in order for his or her fault or negligence to be measured under the statute, owe or have owed a duty recognized by the law to the injured plaintiff.

■ Applying that holding here, we conclude that neither Sweeney nor Meyer & Williams owed plaintiffs Miller and Cloud Base a duty, and thus, they may not be designated as nonparties at fault. *See McGee v. Hyatt Legal Services,* 813 P.2d 754 (Colo.App.1990) (lawyer in dissolution action representing parent owed no duty to child in custody determination); *Weigel v. Hardesty,* 37 Colo.App. 541, 549 P.2d 1335 (1976) (a lawyer is liable to persons other than a client only when the conduct of the attorney is fraudulent or malicious).

Here, the trial court determined that there was insufficient evidence of fraud or malice. We agree with that determination. Hence, the trial court did not err in striking the designation of Sweeney and Meyer & Williams as nonparties at fault.

## IV.

Next, the Attorneys and Southern assert that the trial court erred in holding the defendants jointly and severally liable. We agree.

The intent of § 13–21–111.5, C.R.S. (1986 Repl.Vol. 6A) was to abolish the harsh effects of joint and several liability and substitute the rule that each wrongdoer is liable only for the portion of a plaintiff's injuries that is represented by the wrongdoer's percentage of fault. *Moody v. A.G. Edwards & Sons, Inc., supra.* As a result, the statute dictates that no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant.

■ Correspondingly, the statute directs that the jury must return a special verdict determining the percentage of negligence or fault attributable to each of the parties and forbids the use of a general verdict. These provisions are mandatory. *See People v. Clark,* 654 P.2d 847 (Colo.1982) ("shall" in a statute is presumed to be mandatory).

The provisions of this statute are not limited to negligence actions; rather, it specifically applies to "an action brought as a result of ... an injury to person or property...." Section 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A). *See O'Quinn v. Wedco Technology, Inc., supra* (statute applies in strict products liability action).

■ The claims asserted here arise as a result of an injury to person or property within the meaning of the statute; hence, apportionment of fault between the Attorneys and Southern is required, unless the provisions of § 13–21–111.5(4), C.R.S. (1987 Repl.Vol. 6A) apply.

That portion of the statute provides:

Joint liability shall be imposed on two or more persons who consciously conspire

and deliberately pursue a common plan or design to commit a tortious act. . . .

Here, Miller and Cloud Base did not urge in the trial court that there was a conscious conspiracy, did not argue such to the jury, and did not tender any instructions predicated upon this subsection. Indeed, their motion to amend the complaint to add a conspiracy claim was denied, and that ruling has not been appealed. Nor did they assert in the trial court that the conduct of the Attorneys would be imputed to Southern as a matter of vicarious liability.

Moreover, appropriate instructions were tendered by the Attorneys and Southern which would have required the jury to make the required apportionment. Accordingly, we conclude that, under a similar state of the record on retrial, the jury should be instructed to apportion any damages awarded between the defendants.

## V.

The Attorneys next contend that the trial court erred in not instructing the jury on the elements of a "case within a case." Under the circumstances present here, we agree.

When an action for legal malpractice is predicated upon an error in handling an underlying matter, the claim has been characterized as a "case within a case" requiring proof not only that the lawyers failed to exercise reasonable care, but also that the plaintiff should have been successful in the underlying action if the attorney had performed properly. *Fleming v. Lentz, Evans & King, P.C.*, 873 P.2d 38 (Colo.App.1994).

Here, the situation is somewhat more complex. The claim of Miller and Cloud Base is predicated upon *two* "underlying" issues. First, would there have been a settlement of the wrongful death claim asserted by the passenger's widow if the Attorneys had communicated the settlement offer? If not, then no liability could attach as a matter of law, because there could be no causation or damages. *See Fleming v. Lentz, Evans & King, P.C., supra.*

If, however, a settlement would have been reached, it is then necessary to inquire further and determine what effect the failure of the settlement creates. If the underlying wrongful death claim had been fully litigated to judgment, and the passenger's widow had won, it follows that the failure to settle created any "damage" caused by the entry of any underlying judgment against Miller and Cloud Base.

Conversely, because the underlying wrongful death claim was itself settled by Miller and Cloud Base, the issue then becomes whether the passenger's widow should have prevailed if the wrongful death case had proceeded to trial, and if so, what amount of verdict should have entered?

Accordingly, under the circumstances here, Miller and Cloud Base were required to prove not only that there should have been a settlement of the wrongful death claim, but also that the passenger's widow should have won the underlying case, and the amount that she should have recovered. The jury, therefore, must be correspondingly instructed.

This, in turn, requires the trial court essentially to treat the jury in the legal malpractice case as it would treat the jury in the underlying wrongful death case, *i.e.*, it must also give the instructions that should have been given in the underlying case. *See Lewandowski v. Continental Casualty Co.*, 88 Wis.2d 271, 276 N.W.2d 284 (1979); *Michael Kovach, P.A. v. Pearce*, 427 So.2d 1128 (Fla. App.1983); R. Mallen & J. Smith, *Legal Malpractice, supra*, § 27.25.

Here, the Attorneys tendered a set of jury instructions and special verdict forms that would have instructed the jury on the elements of the underlying case. However, the trial court refused them.

The only instructions given the jury on the underlying case, over objection, were as follows:

> To the extent that any actual damages have been so proved by the evidence, you shall award an amount which will reasonably compensate the plaintiffs for:
>
> > 1. the probable result of the Swisher v. Cloud Base and Miller Claim had the jury rendered a verdict after trial. . . .

No instructions were given concerning the theories of liability, defenses available, including comparative fault and nonparty fault, causation, the measure of damages, or life expectancy of the passenger. Under the circumstances, the failure to instruct the jury appropriately concerning the underlying claim was incorrect.

This holding is not affected by the fact that the claims asserted against Attorneys were framed in terms of breach of fiduciary duty. Some breach of fiduciary duty claims, such as those here, "are basically negligence claims ... often requiring the plaintiff to establish identical elements that must be established by a plaintiff in negligence actions." *Martinez v. Badis,* 842 P.2d 245, 252 (Colo.1992).

▮ Accordingly, on retrial, the trial court must also fully instruct the jury in the malpractice case to determine all issues that should have been determined in the underlying wrongful death action.

In connection with their arguments concerning the necessity of jury instructions regarding the underlying case, Attorneys contend that it was error to allow testimony from legal experts as to the likely outcome and the "value" of the underlying case. However, we find no contemporaneous objection in the record directed to this testimony. Thus, we decline to address the issue for the first time on appeal. *See Matthews v. Tri-County Water Conservancy District,* 200 Colo. 202, 613 P.2d 889 (1980).

## VI.

In their cross-appeal, Miller and Cloud Base first contend that the trial court erred in granting the defendants' motion for a directed verdict on the issue of punitive damages. We agree.

▮ Punitive damages are available only when a plaintiff is able to prove beyond a reasonable doubt that the defendant engaged in "willful and wanton" misconduct. Section 13–21–102(1)(a), C.R.S. (1987 Repl.Vol. 6A). Willful and wanton conduct means conduct purposefully committed which the actor must have realized is dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others,

particularly of the plaintiff. Section 13–21–102(1)(b), C.R.S. (1987 Repl.Vol. 6A).

▮ The sufficiency of evidence to support an award of punitive damages is a question of law for the court. *Tri–Aspen Construction Co. v. Johnson,* 714 P.2d 484 (Colo. 1986).

In determining the propriety of the granting of a motion for directed verdict, we must view the evidence in a light most favorable to Miller and Cloud Base and determine whether, when so viewed and all reasonable inferences are drawn, a reasonable jury could find beyond a reasonable doubt that the conduct at issue was attended by circumstances of fraud or a wanton and reckless disregard of the injured party's rights and feelings. *Palmer v. A.H. Robins Co.,* 684 P.2d 187 (Colo.1984).

▮ Here, plaintiffs argue that the defendants acted purposefully in rejecting the settlement offer without discussing the matter with Miller. They point to testimony at trial which indicates that Southern and the Attorneys knew that Miller was very worried, even frightened, about the outcome of the case.

Further, there is evidence that both Southern and the Attorneys believed the reasonable value of the case was in excess of the available policy limits, yet Southern, when faced with a policy limits offer, determined to present a counteroffer for $5,000 less than demanded. In addition, the Attorneys rejected the policy limits demand without direction from Southern and without consultation with Miller.

Viewing this evidence in the light most favorable to Miller and Cloud Base, we conclude that a reasonable jury could find beyond a reasonable doubt that the acts causing injury were attended by circumstances evincing a wanton or reckless disregard of the rights and feelings of Miller. Consequently, the trial court erred in directing a verdict on this claim, and, under a similar evidentiary posture on retrial, the issue should be presented to the jury.

## VII.

Miller and Cloud Base next assert that the trial court erred in failing to instruct the jury that the measure of damages in this litigation was the amount of the judgment in the underlying case. Specifically, they assert that the trial court erred in disregarding the settlement, which resulted in a stipulated judgment, in favor of evidence as to the "worth" of the underlying case. We disagree.

As a general rule, the "worth" of an underlying case in a subsequent legal malpractice action is established by the judgment entered in the underlying action. *Scognamillo v. Olsen*, 795 P.2d 1357 (Colo.App. 1990).

In the underlying action involved in *Scognamillo*, the plaintiff in the underlying litigation offered to settle with three defendants for the sum of $54,000. Two of the three individuals wished to accept, but the third did not. No settlement was reached, and the case proceeded to trial, with a much higher adverse judgment resulting.

A malpractice action was filed by the three former clients against their attorney, alleging that the attorney had failed to evaluate the case properly, failed to advise the clients of the potential liability, and had improperly undertaken to represent their divergent interests. They claimed actual and compensatory damages in an amount equal to their liability under the judgment, or in the case of one client, the amount for which he settled.

In approving a judgment for the former clients, a division of this court stated:

> In a legal malpractice action, the amount of damages is generally the amount of the judgment entered against the plaintiff in the underlying case.... Accordingly, unless defendants introduced sufficient evidence to show that this general rule was inapplicable, the amount of damages here was indeed fixed upon execution of the ... judgment or, as in the case of plaintiff Scognamillo, entry of a settlement agreement that was intended to satisfy such judgment.

*Scognamillo, supra,* at 1360.

Miller and Cloud Base contend that they are in the identical position as the former clients in *Scognamillo, supra,* because they remain responsible to pay the stipulated judgment of $1.2 million to the passenger's widow. They assert that the court entering the stipulated judgment found that the stipulation was "fair under the circumstances of this case," and thus, the judgment amount is the appropriate measure of damages. We disagree.

First, the amount of the *Scognamillo* judgment was actually decided by a court after a bench trial in which specific evidence was introduced. Here, in contrast, no evidence was adduced before the court that entered the stipulated judgment.

Second, the *Scognamillo* adjudication occurred before an impartial factfinder whereas here the evidence indicated that the amount of the stipulated judgment was essentially dictated by the attorneys for the passenger's widow.

Third, when dealing with consent judgments, courts must be on guard to ensure that there are circumstantial guarantees of trustworthiness concerning the genuineness of underlying judgments such as that here.

As recognized in *Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d 589, 592 (Fla.App.1984):

> The real concern in this type of case is that the settlement between the claimant and the insured may not actually represent an arm's length determination of the worth of the plaintiff's claim. In a situation where the insured actually pays for the settlement of the claim against him or where the case is fully litigated at trial before the entry of a judgment, the amount of the settlement or judgment can be assumed to be realistic
>
> . . . .
>
> However, in [a] case ... involving a consent judgment with a covenant not to execute, the settlement figure is more suspect.

We therefore agree with the trial court that the defendants in this case established an exception to the rule set forth in *Scognamillo, supra.*

Here, Miller stipulated to entry of a judgment for $1.2 million against him, while the passenger's widow agreed in exchange to enter into a covenant not to execute against the judgment. Therefore, under the agreement, Miller did not actually pay any damages, and he will never be required to do so, except upon recovery in this litigation. In addition, although a court did enter judgment against Miller in the amount of the settlement, the court did not have a full opportunity to evaluate the worth of the underlying claim through trial.

In a case such as this, the circumstantial guarantees of trustworthiness which exist when an individual settles for an amount which he pays out of his pocket and may never recover are not present. Therefore, the settlement may or may not adequately represent an arm's length determination of the worth of the plaintiff's claim.

Accordingly, under the unique circumstances of this case, we agree with the trial court that the settlement amount should not have been the measure of damages, and that same rule should be followed on retrial.

### VIII.

Finally, we reject the argument by Miller and Cloud Base that the trial court erred in granting summary judgment on their negligence claim against the Attorneys as time-barred by the applicable statute of limitations.

Miller's negligence claim against the Attorneys was governed by a two-year statute of limitations. See § 13–80–102(1), C.R.S. (1994 Cum.Supp.). Miller argues that the trial court erred in determining that his cause of action accrued on May 8, 1989.

A cause of action accrues when a plaintiff discovers, or reasonably should have discovered, both the injury and its cause. Section 13–80–108(1), C.R.S. (1994 Cum. Supp.). In a legal malpractice action, once a client becomes aware of the attorney's negligence and incurs damage in the form of legal fees to ameliorate the impact of that negligence, he or she has suffered injury for the purpose of accrual of a legal claim. Palisades National Bank v. Williams, 816 P.2d 961 (Colo.App.1991). Moreover, a client's cause of action can accrue before the attor-

ney ceases representation. Morris v. Geer, 720 P.2d 994 (Colo.App.1986).

Here, there was evidence presented that Miller's separate counsel wrote a letter to the Attorneys dated May 8, 1989, in which he alleged that the Attorneys had breached their duty to Miller and acted with "gross ineptitude." This knowledge is imputed to Miller. Dickman v. DeMoss, 660 P.2d 1 (Colo.App.1982). Hence, the claim accrued as of that time, and thus, the trial court correctly concluded that the negligence claims filed more than two years later were time-barred.

Finally, although Miller and Cloud Base assert that the statute of limitations had not run on claims for fraud and breach of contract, we note that they did not complain of fraud or breach of contract in the trial court. Hence, we do not address those claims. See Matthews v. Tri–County Water Conservancy District, supra.

The judgment entered on the jury verdict is reversed. The summary judgment on the negligence claim against the Attorneys is affirmed. The ancillary orders of the trial court are affirmed in part and reversed in part, and the cause is remanded for a new trial consistent with the views expressed in this opinion.

CRISWELL and JONES, JJ., concur.