24CA0898 Marriage of Lilly 04-03-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0898
Boulder County District Court No. 23DR30172
Honorable Dea M. Lindsey, Judge

---

In re the Marriage of

Heather Lilly,

Appellant,

and

Christopher Lilly,

Appellee.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE LUM
Fox, J., concurs
Gomez, J., concurs in part and dissents in part

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 3, 2025

---

Dietze and Davis, P.C., Stephen A. Closky, Joshua E. Anderson, Boulder, Colorado, for Appellant

Aitken Law, LLC, Sharlene J. Aitken, Denver, Colorado, for Appellee

¶ 1　　In this dissolution of marriage proceeding, Heather Lilly (mother) appeals the portions of the permanent orders pertaining to parenting time and school choice.

## I.　　Background

¶ 2　　Mother and Christopher Lilly (father) were married for nineteen years and had two children, who were ages thirteen and ten at the time of permanent orders. During the marriage, father provided economically for the family, and mother stayed at home with — and homeschooled — the children.

¶ 3　　Mother filed for a dissolution of marriage in 2023. At the time, the parties were residing in their marital home in Erie. The parties initially exercised temporary parenting time in a nesting arrangement: the children remained in the marital home full time with whichever parent was exercising parenting time according to the schedule. When not exercising their respective parenting time, mother resided with her parents in Greeley and father resided with his mother in Westminster. However, during the pendency of the case, mother began exercising all of her parenting time in Greeley.

¶ 4　　At permanent orders, mother contended that father was "angry and disengaged" and that he had a strained relationship

with the children. She requested that he have limited parenting time, from Friday to Sunday every other week and a Thursday evening in the alternating weeks. Father testified that he had a positive relationship with the children and that mother's "gatekeeping" and interference caused any strain in his parental relationship. He requested parenting time from Thursday evening to Monday morning every other week, eventually increasing to equal parenting time. The court also heard testimony from the children's therapist and a Child and Family Investigator (CFI). The CFI recommended that father have parenting time every other weekend, and Thursday overnight on the alternating weeks.

¶ 5    After finding that both parents were capable and attributing the strained relationship between father and the children to the rapid changes caused by the divorce, the trial court ordered that father would have parenting time from Friday to Sunday evenings every other week, with a Thursday evening in the alternating week. After fifteen months of this parenting time schedule, the court ordered that the parties would begin sharing equal parenting time using a "5-2-2-5" schedule. To prepare the father and the children for the shift, the court ordered the children and father to participate

in therapy. The court also encouraged mother to engage in therapy to "adjust to the changes in the family dynamic and . . . 'giving the reigns [sic]' to [f]ather in some respects."

¶ 6 Mother requested sole decision-making authority for the children and wished for the children to remain homeschooled. Father requested either joint decision-making authority and orders for the parties to enroll the children in public school or sole decision-making authority. The court ordered the parties to share joint decision-making authority and determined the children should attend public school beginning in the 2025-2026 school year. Until then, the court ordered the children to continue homeschooling with mother.

¶ 7 Mother appeals, arguing that the trial court abused its discretion by ordering equal parenting time and for the children to attend public school.[1]

## II.    Standard of Review

¶ 8 The trial court has broad discretion over the allocation of parental responsibilities, and we exercise every presumption in

---

[1] Mother doesn't appeal the allocation of decision-making authority.

favor of upholding its decision. *In re Marriage of Collins,* 2023 COA 116M, ¶ 8 (parenting time); *In re Marriage of Morgan,* 2018 COA 116M, ¶ 23 (decision-making responsibility). We will not disturb the court's allocation unless the court acts in a manifestly arbitrary, unreasonable, or unfair manner, or unless it misapplies the law. *Collins,* ¶ 8. We will affirm the court's decision so long as the record supports it. *Id.*

¶ 9 When allocating parenting time and resolving parenting disputes — including disputes about school choice — the court must focus on the child's best interests, giving paramount consideration to the child's safety, needs, and physical, mental, and emotional conditions. *See* §§ 14-10-123.4(1)(a), -124(1.5), (1.7), C.R.S. 2024; *cf. In re Marriage of Thomas,* 2021 COA 123, ¶ 38 (court can resolve disputes about school choice where joint decision-makers disagree). In making its determinations, the court must consider all relevant factors, including, but not limited to, (1) the wishes of the child's parents; (2) the wishes of the child (if sufficiently mature to express reasoned and independent preferences); (3) the relationship of the child the parents; (4) the child's adjustment to their home, school, and community; (5) the

parties' past patterns of involvement with the child; (6) the physical proximity of the parties to each other; and (7) the ability of each party to place the needs of the child ahead of their own needs. § 14-10-124(1.5)(a); *see also* § 14-10-124(1.5)(b).

¶ 10    "The court is not required to make findings on all statutory factors." *In re Marriage of Pawelec*, 2024 COA 107, ¶ 44. "Findings must be sufficiently explicit, however, to give the reviewing court a clear understanding of the basis of the order." *Id.*

## III.    Parenting Time

¶ 11    Mother contends that the court abused its discretion by ordering the eventual increase to equal parenting time. She argues that (1) the increase isn't in the children's best interests and (2) the court didn't appropriately consider the parties' proximity to each other. We disagree.

### A.    Best Interests

¶ 12    Mother first argues that the court's factual findings don't support that an increase to equal parenting time is in the children's best interests. In support of her argument, she identifies the court's findings that (1) the children's relationship with father is "strained"; (2) the children told the CFI that they wanted minimal, if

5

any, parenting time with father; (3) the children's therapist reported that the children viewed father as "disengaged and quick to anger"; and (4) the children are anxious and need therapeutic assistance.[2]

¶ 13    However, the court also found that both parties were "capable parents [who are] used to reciprocal roles." It further found that father — whom the court deemed credible — testified about fun outings with the children during his parenting time, at least some of which the children had requested. It also noted the CFI's testimony that third parties who had observed father's parenting reported a strong bond between father and the children.

¶ 14    In addition to these findings, the court expressly found that it did not view father as "emotionally distant" or "angry." Rather, it credited (1) the CFI's testimony that the frustration the children perceived "is likely a product of the stress of the divorce"; (2) the therapist's testimony that the children were anxiety prone and

---

[2] To the extent mother references events that occurred after the permanent orders and after the court's ruling on the C.R.C.P. 59 motion, we decline to consider them in our analysis. *Cf. In re Custody of C.C.R.S.*, 872 P.2d 1337, 1343 (Colo. App. 1993) ("Generally, appellate courts will not consider issues, arguments, or theories not previously presented in trial proceedings."), *aff'd sub nom. Matter of Custody of C.C.R.S.*, 892 P.2d 246 (Colo. 1995).

"have few if any spaces" to which they feel acclimated when "[m]other is not present to provide support and guidance"; and (3) both professionals' testimony that the children would likely blame father for any "unfamiliar territory" in which they found themselves as a result of the divorce. The court also noted that mother had prevented visits between father and the children before the temporary parenting time orders. In light of its findings, the court concluded that "[t]he [c]hildren's reluctance towards time with [f]ather likely comes from the rapid changes the divorce has caused and [f]ather's adjustment to handling the [c]hildren's day-to-day needs when they are in his care."

¶ 15    Under these circumstances, we cannot conclude that the court's order — that father have equal parenting time after (1) an "adjustment period" roughly modeled on the CFI's parenting time recommendation and (2) therapeutic assistance — is an abuse of discretion. The order reflects thorough consideration of the parents' wishes, the children's wishes, the children's mental and emotional needs, the children's relationship with the parents, the parties' past patterns of involvement with the children, and the particular needs of the family involved. *See* § 14-10-124(1.5)(a)(I), (II), (V), (VII), (XI).

¶ 16    We aren't persuaded otherwise by mother's contention that the increase isn't sufficiently "gradual." True, the court could have included more incremental steps between the initial parenting time schedule and equal parenting time. But when reviewing for an abuse of discretion, "we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options." *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230-31 (Colo. App. 2006). Given the length of the "adjustment period" (fifteen months) and the use of therapeutic assistance, the trial court's parenting plan fell within that range.

¶ 17    We also reject mother's contention that the increase in parenting time constituted improper speculation about the children's best interests at a future date. In support of her contention, mother relies on *In re Marriage of Hoffman*, 701 P.2d 129 (Colo. App. 1985). In that case, the court ordered that mother — who lived in California — would be the children's primary parent. *Id.* at 130. However, without explanation, the court also ordered that the children be returned to Colorado within one year. *Id.* A division of this court concluded that "it was impossible for

8

[the trial court] to determine . . . what the children's best interests might be one year following the grant of sole custody to [mother]," and it reversed the judgment. *Id.*

¶ 18    In this case, by contrast, the trial court's implied finding that it was in the children's best interests to have equal parenting time with father after an adjustment period is supported by the findings detailed above. It was also supported by the CFI's testimony that increasing father's parenting time would be appropriate after giving the parties time to adjust and giving father and the children time to improve their relationship. It's true that a court can never know with 100% certainty what might be in the children's best interests at a future date.[3] But we don't view *Hoffman* as establishing a blanket prohibition on any parenting time plan that includes future schedule changes. And to the extent it does, we disagree with it.

## B.    Location

¶ 19    Mother next argues that the court didn't adequately consider the physical distance between the parties. We disagree.

---

[3] This is the case even when a parenting plan has no built-in changes in schedule because children's needs and best interests change over time. For this reason, parents can move to modify a plan that is no longer serving the children's best interests.

¶ 20    At the time of the permanent orders hearing, the parties had agreed to sell the marital residence, which was located in Erie. Mother testified that she intended to reside with her parents in Greeley "temporarily" and "for the time being." When asked where she intended to live after she stopped living with her parents, mother testified that she would live in Greeley or "surrounding cities" depending on what she could afford. Father testified that after the marital residence was sold, he would live somewhere that would be a reasonable commute to and from the children's school. Based on this testimony, the court found that "neither party knows where they will live long-term besides a general idea of location."

¶ 21    First, to the extent mother challenges the court's factual findings about the parties' long-term plans, we decline to disturb them. The findings are amply supported by the parties' testimony. *See Collins,* ¶ 8.

¶ 22    Second, the permanent orders reflect that the court considered the distance between the parties' current residences —about fifty-five miles. For the initial phase of the parenting plan, the court noted that parenting time exchanges should occur on Sunday to allow time for travel. Mother contends that, when the schedule

changes to a 5-2-2-5 plan, the commuting time will be excessive. However, given (1) father's representation that he planned to move to a residence located within a reasonable distance from the children's school and (2) the limited information about mother's long-term plans, we perceive no abuse of discretion. *See id.*

## IV.  Public School Enrollment

¶ 23     Mother argues the trial court abused its discretion because the order for public schooling failed to apply the best interest factors under section 14-10-124(1.5)(a); overlooked "overwhelming[]" evidence that supported homeschooling; inappropriately focused on father's financial concerns; and inappropriately speculated about what the children's best interests would be in the future.  We disagree.

¶ 24     The court's order reflects a thorough and reasoned consideration of the relevant factors impacting the children's best interests pertaining to school choice.  On one hand, the court found that, under mother's homeschooling, the children had met all of Colorado's academic standards and received necessary academic accommodations.  It also noted father's agreement that mother had "educated the [c]hildren well" and that homeschooling was "perfect"

11

during the COVID-19 pandemic. The court also credited the therapist's and CFI's testimony endorsing a continuation of homeschool "for the time being," though it noted that both professionals testified that the children could be transitioned to public school gradually and with therapeutic assistance.

¶ 25 Nonetheless, the court also found that both children showed aptitude for science and robotics, and it noted mother's testimony that she lacked experience or expertise in scientific fields. The court also found that mother "struggle[ed] to accept opinions from qualified experts that differed from her own." Furthermore, the court found that the children were "under-equipped to handle unfamiliar environments given how easily their anxiety is triggered when they do not sense [m]other's presence or approval in some fashion." And it found father's desire to introduce children to differences in their community to be "insightful and responsible." The court additionally found that father "would struggle to afford supporting two households if [m]other's earnings are capped by the time she must dedicate to homeschooling." It noted that this concern was reasonable, particularly given the therapist's and CFI's testimony that financial struggles stress both parents and children.

¶ 26    Given these findings, the court's order for the children to continue homeschooling for the next academic year, participate in therapy geared toward helping them transition to public school, and enroll in public school for the 2025-2026 school year isn't an abuse of discretion.

¶ 27    We aren't persuaded by mother's arguments that the court improperly focused on financial concerns and that the evidence "overwhelmingly" favored homeschooling. Father's financial concern was one of many factors the court considered in making its decision, and the testimony that financial strain causes stress for children links the economic considerations to the children's best interests. And while mother cites to evidence that might have supported a finding that homeschooling was in the children's best interests, she essentially asks us to reweigh conflicting evidence, which we can't do. *Cf. In re Marriage of Evans*, 2021 COA 141, ¶ 45 ("We are not at liberty to re-evaluate the conflicting evidence and set aside findings supported by the record."). We also reject mother's contention that the trial court improperly speculated about the children's future best interests. To the contrary, the court found that, *at the time of permanent orders*, it was in the children's best

interests "to continue homeschooling as part of a plan to transition into public schooling," and the court tailored its order to facilitate such a plan.

## V. Attorney Costs and Fees

¶ 28 Both parties request appellate costs. *See* C.A.R. 39(a). Given our disposition, we award father his appellate costs and remand to the trial court for calculation of such costs. *See id.; see also In re Marriage of Capparelli*, 2024 COA 103M, ¶ 40.

¶ 29 Mother also requests appellate attorney fees pursuant to C.A.R. 39.1 and section 14-10-119, C.R.S. 2024. We deny her request because, while she cites the law under which she requests an award of fees, she provides no factual details about the parties' respective financial resources. *See* C.A.R. 39.1 (request for attorney fees must explain the legal *and* factual basis for the award); *see also In re Marriage of Roddy*, 2014 COA 96, ¶ 32.

## VI. Disposition

¶ 30 The judgment is affirmed. This case is remanded to the trial court with directions to calculate the amount of father's appellate costs.

JUDGE FOX concurs.

JUDGE GOMEZ concurs in part and dissents in part.

JUDGE GOMEZ, concurring in part and dissenting in part.

¶ 31    I agree that the judgment should be affirmed.  I part ways with my colleagues only as to the issue of appellate attorney fees.

¶ 32    It is true that our appellate rules require a party seeking appellate attorney fees to include in their principal brief "a specific request, under a separate heading," that "explain[s] the legal and factual basis for an award of attorney fees."  C.A.R. 39.1.  Moreover, "[m]ere citation to [C.A.R. 39.1] or to a statute, without more, does not satisfy the legal basis requirement."  *Id.*; *see also In re Marriage of Evans*, 2021 COA 141, ¶ 76 (enforcing this requirement); *In re Marriage of Wright*, 2020 COA 11, ¶¶ 39-40 (same).

¶ 33    However, I believe that mother's appellate attorney fee request sufficiently satisfied this requirement.

¶ 34    As to the legal basis for mother's request, mother cited the statute providing a basis for an award of attorney fees — section 14-10-119, C.R.S. 2024.  She also explained that under this statute, "[t]he [c]ourt has discretionary authority to consider the financial resources of the parties, and when a disparity exists, order a party to pay a reasonable amount for the cost of maintaining or

16

defending a proceeding under Title 14 of the Uniform Dissolution of Marriage Act."

¶ 35 And as to the factual basis for mother's request, implicit in the request — and, to some extent, in mother's appellate arguments — is an assumption that there is a disparity in the parties' financial resources, such that mother may be entitled to recover some portion of her attorney fees from father. While mother didn't provide further information about that disparity, she may well not exactly know what it is. Courts generally assess such a disparity on the parties' "current financial resources" after the appeal has concluded, at the time the fees are being assessed. *In re Marriage of Collins*, 2023 COA 116M, ¶ 86; *In re Marriage of Bochner*, 2023 COA 63, ¶ 22; *see also In re Marriage of Martin*, 2021 COA 101, ¶ 42 (directing the trial court on remand to determine fees under section 14-10-119 "based on the parties' relative financial circumstances at that time"). Yet mother likely doesn't have updated information on father's financial situation and how it compares to hers. So I wouldn't fault her for not providing more information in her principal brief and would conclude that her implicit reference to a

financial disparity is sufficient to establish the factual basis for an award of appellate attorney fees.

¶ 36 Accordingly, I wouldn't reject mother's request for appellate attorney fees outright.  Instead, because the trial court is better equipped to assess and make factual findings regarding the parties' current financial resources, I would remand the issue to the trial court.  *See Collins*, ¶ 86; *Bochner*, ¶ 22.